227 So.2d 296 (1969)
Leslie DOVER
v.
STATE of Mississippi.
No. 45471.
Supreme Court of Mississippi.
October 20, 1969.
*297 Ney M. Gore, Jr., Marks, Walter E. Dreaden, Jr., Lambert, for appellant.
A.F. Summer, Atty. Gen., by Guy N. Rogers, Asst. Atty. Gen., and Velia A. Mayer, Sp. Asst. Atty. Gen., Jackson, for appellee.
PATTERSON, Justice:
Leslie (Blue) Dover was indicted by a grand jury of Quitman County for the murder of E.B. Mitchell. He was convicted of manslaughter and sentenced to serve ten years in the state penitentiary. He appeals and assigns as error the following:
1. The court erred in admitting the testimony as to the alleged confessions and admissions of the defendant.
2. The court erred in admitting the shirt allegedly worn by the decedent at the time he was shot.
3. The court erred in granting the State its instruction on manslaughter.
The following facts and circumstances are revealed by the record. On Thursday evening, June 1, 1967, E.B. Mitchell (the decedent), Morris Gregory, Jessie Doty and Junior Hall were at the home of Jessie Doty. All were drinking heavily at the time with the possible exception of Hall. The appellant came to Doty's home. Thereafter Mitchell joined the appellant in his truck which the appellant drove across the road to the house of Phillips Ellis.
Ellis testified that when he returned to his home at about 9:00 p.m., he discovered the appellant's pickup truck in his driveway, with Mitchell sitting in the right side. Though Ellis recognized the vehicle as that of the appellant, he was unable to identify the person on the driver's side. Ellis further testified that the truck backed out of his driveway and pulled across the road where it stopped and that he did not observe it thereafter.
The record reveals that Gregory, one of those present at Jessie Doty's home, was the same evening returned to his home in a drunken stupor by his companions. Mrs. Gregory testified that about 2:00 a.m. on Friday, June 2, the appellant woke her by knocking on the door and requesting to see her husband, but that she refused to wake him. She testified that appellant's truck was parked under the front porch light and that there was a "blackheaded, dark complected man" therein whom she did not recognize. She also testified that when the appellant attempted to back out of her driveway, he was aided in this effort by an occupant of the truck who held a light for the driver; that she did not observe anything unusual about the person attempting to aid the driver of the truck. Thereafter, apparently unable to back out of the driveway, the truck ran across the front part of the yard and circled through the driveway of her son's home and departed.
Ruffin Fyfe, a witness for the State, related that he was acquainted with both the appellant and Mitchell; that about four o'clock p.m. on Friday he saw the appellant in the office of Dr. House. He stated further that Mitchell was on the operating table in the doctor's office when the following conversation occurred between the appellant and the doctor.
*298 "A. Doctor House asked him what happened, and he said, `He got shot.' Doctor House said, `Did you shoot him?' and he said, `No, sir', said, `He was already shot when I found  when the  when I found him', I think he said, said, `He spent the night at my house last night.'"
Mitchell was transferred to the Coahoma County Hospital later that afternoon where he was examined by Dr. Julius Levy. Dr. Levy testified that Mitchell was conscious upon arrival and told him that he had been shot about ten o'clock the night before. Dr. Levy also testified that Mitchell expired the following morning as the result of internal bleeding from three bullet wounds.
Clint Turner, the Sheriff of Quitman County, testified that on the first Friday in June 1967, he received a call from Clarksdale that Mitchell had been shot. During the course of his investigation he tried without success to question Dr. House who was hard of hearing. Thereafter, he went to a beer joint outside the town of Sledge where he met two of the appellant's brothers. He advised them that he wanted to see the appellant. Upon being advised that the appellant lived in Tunica County, he told them what had happened, "that we wanted to see Blue and talk to him; he's been  he'd been accused of shooting Mitchell. They said, `Well, we'll go over there with you' * * *" Upon arriving at the home of the appellant, the sheriff asked him if he owned a 22-caliber pistol. The appellant's reply was in the negative, whereupon the sheriff departed without arresting the appellant. The sheriff testified that he did not warn the appellant of his constitutional rights prior to this questioning.
Later that night the sheriff determined that the appellant did own a 22-caliber pistol and on Saturday morning he learned that Mitchell had died. The sheriff returned to the appellant's home, but the appellant was not there. He then went to the home of Cordis Dover, a brother of the defendant, and told him to bring the appellant and his pistol to the office. On his way back to the county seat Sheriff Turner stopped at Jessie Doty's home, and finding blood on the floor and the door torn down, arrested Doty and took him to jail. However, no charges were ever pressed against him. After attending an autopsy upon the body of Mitchell, the sheriff returned to his office where he found the appellant with Cordis and Leon Dover, his brothers, and Mrs. Sybil Miller, his sister. Mrs. Miller turned a 22-caliber pistol over to Sheriff Turner. Chester Quarles, an expert witness for the State, later testifed that the bullets removed from the body of Mitchell had been fired by the same 22-caliber pistol which Mrs. Miller turned over to Sheriff Turner.
Thereafter, a sharply contested colloquy transpired between the Dover brothers and their sister on the one hand, and the sheriff and later the sheriff and district attorney, on the other. The substance of the testimony on behalf of the appellant was that he was never warned of his constitutional rights by the sheriff nor was he warned by the district attorney prior to the appellant's making a confession that he killed Mitchell. To the contrary, the sheriff testified that he did not conduct an interrogation pending the arrival of the district attorney, whom he had called, and that the district attorney upon his arrival fully warned the appellant of his constitutional rights before the interrogation was conducted which resulted in appellant's confession that he had shot Mitchell.
Subsequent to the confession the appellant was placed in jail. The following Monday he called the sheriff to the jail and stated that he wanted to get a shirt, whereupon the sheriff asked, "you mean Mitchell's shirt?" to which the appellant replied, "I can get Mitchell's shirt and I want a shirt for myself." Thereupon the appellant accompanied the sheriff to the home of Mrs. Miller, his sister, where he *299 obtained a shirt from a laundry basket. He identified this shirt, which was blood-stained and punctured by bullets, to be that of Mitchell.
The testimony of Cordis and Leon Dover, brothers, W.E. Dover, father, and Mrs. Sybil Miller, the sister, was to the effect that appellant was below normal in intelligence, was unable to read and write, was unable to progress beyond the second grade in school. The brothers and sister further testified that appellant was forty-five years of age and lived alone though they constantly checked upon and saw to his needs. It was admitted by them that appellant owned the truck, but that he had no driver's license.
Prior to trial the appellant was twice confined in Whitfield for observation. Dr. Stary, a member of the medical staff of that institution, testified that the appellant was referred to him for psychological testing; that the result of the intelligence test which included the Wechsler adult intelligence scale, a "house-tree-person" drawing test, and the Rorschach test, the last two for determining personality, was that the appellant had an Intelligence Quotient of 60 and that he was diagnosed as having a moderate mental retardation or moderate mental defective range. It was further established that a figure between 90 and 110 would be considered as average intelligence; that the mean is 100 and that the defendant was 40 points below normal. The doctor also testified as a general truth that a person with an Intelligence Quotient of 60 and who is classified as a moderate mental retardation or moderate mental defective, does not exercise as good judgment under periods of stress as he does in periods not under stress.
Dr. Anderson, a staff psychiatrist at Whitfield, testified that on the appellant's second visit he was assigned to his ward and was under his supervision. He testified that the appellant received a diagnosis of mental deficiency moderate; that he became somewhat bewildered and befuddled when in the presence of the general staff, approximately fifteen persons, and that this was not unusual for a person with this mental diagnosis. He testified:
It was further my opinion, as the unanimous opinion of the staff, that this man does know right from wrong in that sense of the word, but at the same time Mr. Dover at sometimes when he becomes bewildered, befuddled, he at times can be highly suggestible. This you would expect from a moderate mental defective. He at times that I observed him has become a rather anxiety ridden individual. This I find in some people, of course, who are not mental defective; some people show their anxiety in many ways, but I think that here you have an individual who is certainly functioning in a moderate defective range, with an I.Q. of sixty; under times of stress, this individual, in this range, his judgment on certain matters certainly would not be as good as an individual with an I.Q. of ninety, on the other hand, I don't want to mislead the jury on this  on the other hand, with a normal I.Q. of ninety-five, maybe, at times can show not the best judgment in the world under stressful situations, but Mr. Dover at times when I observed him was an anxiety ridden individual functioning in that way, and at times, especially under stress, on at least one occasion I can think of, he was a highly suggestible type of individual.
He also testified that being interrogated as a suspect for murder would be a stressful situation in his opinion.
Dr. Phelps, a general practitioner of Marks, testified that he had two occasions to observe the appellant as a patient and that it was his opinion that his mentality is less than average and that in fact he was called to the courtroom at some juncture of a preliminary hearing when the appellant had fainted as the result of nervousness or malnutrition. It was his opinion the judgment of a person with less than average intelligence would be affected *300 when involved in a situation regarding the law.
Though not the basis of an assignment of error of the defendant, the State contends that the trial court erred in not admitting the evidence of Sheriff Turner concerning the appellant's denial on Friday afternoon that he owned a small caliber pistol, since this interrogation was during an on-the-scene investigation prior to accusation and therefore warnings of constitutional rights were not required. Though the State correctly relates the law as pronounced in Nevels v. State, 216 So.2d 529 (Miss. 1968), it is not controlling here because the sheriff testified he did not warn the appellant of his constitutional rights though he was then accused, but not in custody. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966). We are of the opinion the argument of the State fails under these facts.
A hearing apart from the jury was conducted by the trial court to determine the validity of the defendant's confession. From conflicting evidence the court found the confession was voluntarily made and permitted the sheriff to testify thereasto upon the jury's return.
The crux of this suit is whether the court erred in admitting the alleged confession and admissions of the defendant. Specifically, it is whether a person with an Intelligence Quotient of 60 and diagnosed by competent physicians to be moderate mentally retarded or a moderate mental defective, such retardation or deficiency increasing under stress, can knowingly, voluntarily and effectively waive his constitutional right against self-incrimination. in Miranda, supra, it is stated:
If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. * * * 384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724.
In accord with Miranda we held in Harvey v. State, 207 So.2d 108 (Miss. 1968), that a defendant, though an 18-year-old youth, with the same mental quotient and diagnosis as the appellant, was incapable of effectively waiving his constitutional rights. We there opined:
In the instant case the expert testimony shows that the defendant functioned at a level of an eight to twelve-year-old boy, but that when he became upset his ability to function decreased. The psychologist testified, "I would say he is like a child to the extent that a child of the level of his mental ability would be likely to be led." One of the officers who heard the confessions said, "He was more than willing to give us the statement for at the time he appeared like he didn't think there was nothing to it." Applying the law to the facts in this case, we have reached the conclusion that the alleged confession of the defendant should not have been admitted into evidence before the jury. The evidence did not show the confession to be voluntary beyond a reasonable doubt, and we are not prepared to say that a mentally deficient person of the caliber shown here can waive his constitutional rights. 207 So.2d at 117.
In applying the standard pronounced to the mentality of this appellant, we cannot say that the confession was voluntary beyond a reasonable doubt. Conceding arguendo that the trial court correctly decided the facts leading to the confession, we are not prepared to state that a mentally deficient person of the caliber shown here can knowingly and effectively waive his constitutional rights. We are of the opinion that the trial court erred in permitting the confession to be introduced in evidence.
The appellant next contends that the court erred in allowing the testimony *301 of Sheriff Turner in evidence as to the circumstances concerning the location and identification of Mitchell's shirt. It had been located and identified pursuant to a question propounded by the sheriff to the appellant subsequent to the confession. This question has given the writer of this opinion great concern and is not easily solved. We find in 29 Am.Jur.2d Evidence section 531 (1967) the following:
The Supreme Court of the United States has held that a defendant's constitutional rights are violated if his conviction, in a federal or state court, is based, in whole or in part, on an involuntary confession, regardless of its truth or falsity, and that this is so even if there is ample evidence aside from the confession to support the conviction. These holdings have resolved the disagreement among the state courts as to whether an involuntary confession is admissible, in whole or in part, where facts disclosed thereby are found to be true. It is not clear, however, as to whether facts discovered because of the confession, as distinguished from the confession itself, are admissible in evidence. Many of the state courts have admitted evidence of inculpatory facts discovered by reason of an inadmissible confession, but other cases have held or indicated that evidence of such facts is inadmissible under the "fruit of the poisonous tree" doctrine. In still other cases, the courts have established an exception to the admissibility of evidence obtained by aid of an inadmissible confession to the effect that the thing found must be identified by evidence other than the confession.
Under Footnote 1 of the above section, the case of Belote v. State, 36 Miss. 96 (1858), is cited as supporting the proposition that evidence of inculpatory facts discovered by reason of an inadmissible confession is admissible into evidence. However, Footnote 3 of this same section cites Whitley v. State, 78 Miss. 255, 28 So. 852 (1900), as supporting an exception to the admissibility of evidence obtained by aid of an inadmissible confession to the effect that the thing found, if material and relevant, must be identified by evidence other than the confession. We are of the opinion that the evidence appertaining to the shirt falls within the exception noted above and that if it is to be admitted in evidence, it must be identified by evidence other than the involuntary confession or admissions subsequent thereto. The admission of a mentally retarded person, in our opinion, is governed by the same evidentiary rules as those applying to the confession. We conclude that the trial court committed reversible error in admitting the confession, as well as the admission concerning the shirt, into evidence.
The next assignment of error is that the court erred in granting a manslaughter instruction. We are of the opinion that this assignment is not well taken as this Court has stated many times that where the evidence is sufficient to convict for murder, the defendant, if convicted of manslaughter, cannot complain of the granting of a manslaughter instruction. Perkins v. State, 229 Miss. 299, 90 So.2d 650 (1956), and Thigpen v. State, 219 Miss. 517, 69 So.2d 241 (1954).
Reversed and remanded.
GILLESPIE, P.J., and INZER, SMITH and ROBERTSON, JJ., concur.