384 So.2d 1171 (1980)
Thomas Lee HINES
v.
STATE.
6 Div. 933.
Court of Criminal Appeals of Alabama.
March 18, 1980.
Rehearing Denied April 22, 1980.
*1172 U. W. Clemon of Adams & Clemon, Birmingham, Elaine R. Jones, Brent E. Simmons, James Liebman, Jack Greenberg, New York City, for appellant.
Charles A. Graddick, Atty. Gen., James F. Hampton, Sp. Asst. Atty. Gen., for appellee.
BOWEN, Judge.
In an atmosphere infected with racial conflict and tension the black defendant was convicted for the rape of a white Decatur railway clerk. Sentence was fixed at thirty years' imprisonment.
Although several issues have been raised on appeal, the most significant one involves the defendant's mental subnormality as affecting the voluntariness and admissibility of his confession.

I
Under the Constitutions of the United States and the State of Alabama, any suspect of a crime is guaranteed the right of assistance of counsel and the right to remain silent during in-custody police interrogation. So sacred are these rights that any statement obtained in violation of *1173 them is inadmissible in a subsequent criminal proceeding. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The suspect may, of course, waive these rights provided that the waiver is knowingly and intelligently made. Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). However, the United States Supreme Court has stated:
"[A] heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. Escobedo v. State of Illinois, 378 U.S. 478, 490, n. 14, 84 S.Ct. 1758, 1764, 12 L.Ed.2d 977. This Court has always set high standards of proof for the waiver of constitutional rights, Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), and we reassert these standards as applied to in-custody interrogation."
Miranda, 384 U.S. at 475, 86 S.Ct. at 1628.
An extrajudicial confession is prima facie involuntary and inadmissible. C. Gamble, McElroy's Alabama Evidence, § 200.02(1) (3rd ed. 1977). The prosecution must prove "at least by a preponderance of the evidence" that the confession was voluntary. Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).
The major question presented by this appeal is whether the evidence in the record sustains the trial court's determination that the "high standards of proof" for the waiver of constitutional rights were met in this case. We conclude that it does not.
On Monday, May 22, 1978, the defendant came to the court reporting office of Barbara Woods in the Morgan County Press Building in Decatur and asked for a job. Mrs. Woods told him that she did not have any employment available.
The next morning, May 23, the defendant returned to the office and "peered" in the windows on both the east and south sides of the building. Mrs. Woods telephoned the police between 10:00 and 10:30 A.M.
Officer Keith Russell and his partner of the Decatur Police Department responded to the call and talked to Mrs. Woods. They obtained a description and searched the area with a total of six officers. Within a short time they found the defendant filling out a job application[1] at Automatic Screw Machine Company which was located only a short distance across an adjacent parking lot from Mrs. Woods' office.
Officer Russell recognized the defendant from having seen him on two prior occasions and knew his name "from working the area and knowing the names of some of the people." He had known the defendant for six or seven months. Russell stepped inside and asked, "Tommy, would you mind stepping outside for a moment and talking with me?" Russell initially testified that the defendant replied "sure," but later stated that the defendant did not say anything at that time but just stepped outside with him.
Because of the alleged activities of the defendant that morning, "peeking in the windows, acting suspicious," and because Officer Russell thought that the defendant matched the description of a rape suspect[2], Officer Russell immediately read the defendant his constitutional rights from a printed card. Officer Russell stated that he did not read the defendant his constitutional rights "in one phrase" and did not read the "whole thing" at one time but "asked him in between those phrases like anything you say will be used against you in Court, *1174 do you understand your constitutional rights." The defendant indicated that he understood his rights and wished to talk. Officer Russell then "frisked" the defendant for weapons. Officer Russell testified that the defendant became nervous and agitated after being read his rights and "began looking around rather nervous."
When the defendant denied looking in Mrs. Woods' windows, he was placed in the back seat of a patrol car and driven to Mrs. Woods' office, where he was identified. Officer Russell then radioed Detective Sergeants Doyle Ward and Robert Clark and told them he had a suspect in custody. He testified, "I worded it ten-fifteen, J.W., that means I have a prisoner in custody," and he told them he had someone that they needed to talk with. After the defendant was identified, he was still nervous and agitated and put his head in his hands. Officer Russell testified, "I asked Tommy if he would go down to City Hall with us to talk with the detectives and also explained again in plain language that he did not have to do so and also his constitutional rights without using the card."[3] The defendant stated that he understood and would "be glad" to go.[4]
On the way to City Hall, according to Officer Russell, the defendant became "nervous and agitated" and placed "his head in his hands and began rocking back and forth." The defendant was becoming "increasingly agitated" and his behavior indicated to Officer Russell that "something was bothering him." Russell asked the defendant "keeping in mind what your constitutional rights are, why don't you get it off your chest, it is bothering you," and the defendant stated, "I know." Officer Russell continued:
"I then said why don't you tell me about it, got no response and then I believe I asked him again, I said when was the last time you went to the post office and he stated six weeks ago. I then asked what did you do with the can and he said I threw it in the garbage. I said how many women have you raped, two or three, and he stated three."
Officer Russell said he then stopped questioning the defendant: "I felt in my mind that I should not go any further."
Officer Russell described the defendant's "emotional appearance":
"Once, when we stepped outside the Automatic Screw Machine Company he became rather agitated and nervous, he became increasingly so as we went up and had him identified and put him in the rear of the patrol unit, talk[ed] with him a moment and let the ladies look at him. I told him just to relax, everything will be fine and he became nervous on the way to City Hall, agitated."
Russell did not know that the defendant was retarded and "assumed" that he understood what was "going on." Officer Russell stated that the defendant answered his questions "coherently in his speaking, not slurring of the words or anything of that nature" although his responses were "somewhat slow." Officer Russell was "convinced that he understood his rights without any coercion," and testified, "I felt he understood his rights completely." However, Russell did not know if the defendant understood the phrase "constitutional rights."
Officer Russell said he and the defendant arrived at City Hall "right at 10:30 A.M." and the defendant was turned over to Detective Sergeants Ward and Clark. At this time Sergeant Ward had interviewed neither any suspects nor the victim of the rape for which the defendant was later tried and convicted.
In an office in the detective division, Sergeant Clark advised the defendant of his *1175 rights from a printed form. The defendant indicated that he understood his rights. To Sergeant Ward, the defendant was "basically calm, ... considering the circumstances." Sergeant Clark asked the defendant to take the form and read it. The defendant looked at the form, and then, according to Sergeant Ward:
"Sergeant Clark asked Mr. Hines if he understood his rights, Mr. Hines stated he did, Sergeant Clark then asked Mr. Hines if he understood he didn't have to talk to us, he had the right to have an attorney present."
The defendant indicated that he understood, and at 10:35 A.M. he signed a waiver of rights, signing his name as "TOMMY iNESH." Sergeant Clark then interrogated the defendant about "another matter" under investigation. At approximately 11:00 A.M. the defendant directed Ward and Clark to the scene of another rape and gave them the details surrounding the crime. They returned and the defendant was placed in the city jail around 11:45 A.M. Sergeant Ward stated that the defendant was "cooperative" during this interview session, and that the defendant did not cry or shake. Ward said he knew that the defendant "did not read well" but did not know that he was mentally retarded.
At 1:30 P.M. Sergeant Clark again advised the defendant of his constitutional rights, using a printed form. According to Sergeant Ward:
"Sergeant Clark asked him if he understood and he stated he did. At this point Sergeant Clark again gave him the form and asked him to read it, he looked at it and handed it back to Sergeant Clark. Sergeant Clark asked him if he understood his rights and he stated he did and Sergeant Clark again asked him if he understood, he didn't have to talk to us and that he had the right to have an attorney present and Mr. Hines stated that he did and Sergeant Clark again asked the subject to sign the form."
The defendant signed "TOMMY iNES."
At this time the detectives "discussed some other matters" with the defendant. At 1:30 P.M. Ward and Clark took a written statement from the defendant "concerning another matter." At 2:57 P.M. the defendant's second oral statement was reduced to writing. Ward read it to the defendant, who stated that it was correct. After looking at the statement, the defendant signed this statement at 3:25 P.M. In this second statement the defendant admitted the rape for which he was later tried. At 2:50 P.M., just before this statement was taken, the defendant was again advised of his rights by Sergeant Ward, who used a printed form.
Sometime during the afternoon, Sergeant Ward asked the defendant about calling his parents. Ward testified that the defendant responded that they didn't have a phone and that he was going to try to get in touch with somebody else. Ward stated that he told the jailer to let the defendant call somebody but he did not know if the defendant ever contacted anyone. Sometime on May 23rd, Ward spoke with Steve Wynn, a friend of the defendant's: "He asked me if his (defendant's) parents had been notified and I told him to my knowledge they had not and I asked him to go by and let them know and he agreed to do so."
At 7:45 P.M., on the same day of his arrest, the defendant was taken to the Southern Freight Depot where the charged offense had occurred. He made some statements and explained how the crime was committed.
A third statement was taken from the defendant the following day, May 24th. The statement started at 7:42 A.M. and was completed at 7:55 A.M. Sergeant Ward admitted that on the morning of the 24th the defendant's father was not allowed to see the defendant.
Richard Hines, the defendant's father; Alfonzo Robertson, the minister at the defendant's church; Maggie Holmes, a case worker who gave the defendant individual instruction in her home before the school for the mentally retarded opened; Cora Daily, a neighbor; Tim Dunlap, a teacher-supervisor *1176 for the Decatur Adult Center; and Marvin Dinsmoore, the central president of the board of directors for the center, all testified to their knowledge of the degree of the defendant's mental retardation.
Floyd Jones, a defense witness, was a parttime carpet installer. On May 23, 1978, he was repairing some carpet at the Decatur City Hall in a courtroom located right above the detective offices where the defendant was being questioned. In contradiction to Sergeant Ward's testimony that the defendant never cried out during the time he was in custody, Mr. Jones stated that he heard "somebody hollering, `Oh Lord, Leave me alone,'" and "`Oh Lord, Oh Lord, my God, you leave me alone, I ain't done nothing.'"
Around 4:00 or 5:00 in the afternoon, Mr. Jones went to tell Mr. Richard Hines that his son was in the city jail.
Eddie Marshall, who was helping Mr. Jones that day, saw the defendant in the window of the detective's office. Around 2:30 or 3:00 that afternoon he heard somebody say "Oh Lord, Oh Jesus, I ain't did nothing."
Billy Hines, the defendant's brother, first learned around 5:30 on the afternoon of May 23 that the defendant had been arrested. He went to the city jail around 6:15 P.M. but was not allowed to see the defendant, and Sergeant Ward told him that "the best thing was to leave." The defendant's brother testified that Sergeant Ward "told us that he could lock us up." Billy Hines went on three different days to visit his brother but never was allowed to see him.
The defendant, at the time of the crime, was twenty-five years old. Every professional who testified admitted that the defendant was at least moderately mentally retarded with an I.Q. of 39. Every professional except Dr. Edwin C. Seeger gave the defendant a mental age of six years and four months.
Testifying for the defense was Jack Anderson, a psychiatrist who was a clinical Professor of Psychiatry at the University of Alabama School of Medicine. Dr. Anderson examined and interviewed the defendant on three different occasions in September of 1978. Based on these interviews and a review of the defendant's mental history, Dr. Anderson's conclusion was that "at very best, his best level, he was never able to operate intellectually above an I.Q. of between 35 to 45 at his very best." Dr. Anderson classified the defendant in the moderate mental retardation range with a mental age of six years and four months.
Dr. Anderson testified unequivocally that the defendant could not understand or waive his Miranda rights:
"[T]he Miranda wording that you gave there is much beyond the ability of anyone in the moderate level of intelligence to understand at all."
* * * * * *
"No, I don't believe he had any chance in the world of understanding them as far as waiving them, he would think that was something you did with a flag, waiving in the abstract sense, he would never be able to understand that concept."
Dr. Anderson also stated that moderate level mental retardates are "highly suggestible":
"... [T]hey tried to go along with people that they suspect are in authority, for example, I ask[ed] this young man where we were when I saw him and he obviously didn't know, so, I asked him if we were in Atlanta and he said yes, we are in Atlanta. In fact, we were in Birmingham, Alabama. I could have said New York, he would have said sure, New York, that kind of suggestibility, yes."
Ferris O. Henson was an Associate Professor of Special Education at Alabama A & M University. He taught courses in how to teach the mentally retarded. He examined the defendant approximately six weeks before trial. He classified the defendant in the trainable but not educable level of retardation, meaning that the defendant could be taught to perform simple but not complex tasks, and said that, at the defendant's level, tying a shoe would be a complex task.
*1177 After testifying that the defendant could not understand certain abstract concepts contained in the Miranda warning, Dr. Henson concluded:
"I doubt that anyone functioning at Tommy's level would know what a constitution is, let alone of the implication it included...."
* * * * * *
"Q. Dr. Henson, if the Miranda Warning was read one time to a person of Tommy Hines' mental status, could he understand it?
"A. No, they couldn't understand it if you read it ten times.
"Q. Why?
"A. Again, there are too many abstract concepts involved. What we have to realize is that people functioning at Tommy's level cannot abstract...."
Dr. Henson also testified that the defendant was susceptible to suggestion:
"... [M]entally retarded individuals usually respond very positively toward authority figures." According to Dr. Henson, police officers are authority figures: "[T]hese would be people of authority and so, a person functioning at Tommy's level has learned to externalize their focus of control and seek guidance from authority." He further stated:
"They would more or less probably try to say what they thought that person wanted to hear, you see, because this association with the authority figure is the closest thing to an ego or self-concept, a mental[ly] retarded individual can have.... so, what happens in this kind of situation is that there is a kind of conforming behavior and passive behavior in a person that functions at that level."
Dr. Henson noted that being placed in a police car would create a very stressful situation causing tension and anxiety and would cause a "deterioration of performance." Persons functioning at the defendant's level "would know they were in trouble, they were in big trouble, the police came to get them. Now, they wouldn't know why they were in trouble, they would know they were in trouble, again, because the police came to get them." Considering the conditions the defendant faced in the police car, Dr. Henson stated, "I wouldn't give any real significance to replies made at that time, because, of the state of the person, in other words, it wouldn't be a very reliable time to get information from this person." Dr. Henson stated that in his professional opinion the defendant could not knowingly and intentionally waive his Miranda rights: "Unequivocally, no, he could not."
Jowel Loftin was employed as a Psychologist II with the Alabama Department of Mental Health at the Lurleen B. Wallace Center. He was the only professional called by the State or the defendant who had examined the defendant before the crime charged was committed.
On October 22, 1977, he administered the Stanford-Binet Intelligence Scale and the Peabody Speech Vocabulary Test to the defendant. Loftin said the defendant achieved a mental age of six years and four months and an I.Q. of 39, and fell "toward the lower end of the range of the moderate level of mental retardation." This witness testified to the test results but did not express an opinion as to whether the defendant could knowingly and intelligently waive his constitutional rights.
To prove that the defendant was capable of knowingly and intelligently waiving his constitutional rights, the State called Dr. Thomas Luther Smith, Jr., a psychiatrist with a law degree, who is a member of the Alabama Bar Association although not actively engaged in the practice of law. Dr. Smith was a consultant at Bryce Hospital and a member of the Forensic Unit that found the defendant competent to stand trial.
The defendant was admitted to Bryce Hospital pursuant to court order on June 23, 1978, and was given physical and mental examinations. Dr. Smith said he reviewed the defendant's history and found that the defendant had "a clear idea about the concept of right and wrong at that point."
*1178 Although Dr. Smith testified that the defendant could understand the Miranda warning, his conclusion that the defendant could intelligently waive his constitutional rights was conditional:
"Q. Do you feel that he understood or would understand what he was doing if he waived those rights and made a statement to the police officers on May the 23rd, 1978?
"MR. HAIRSTON: Objection, Your Honor.
"THE COURT: Overruled.
"A. Yes, sir, I believe that he would, at the level, if it was put the way that you are stating it, but, not the reading of it.
"QUESTIONED BY MR. MOEBES:
"Q. Not the reading, if it were read to him orally by a police officer?
"A. And explained in the sense that you just."
* * * * * *
"Q. You are misunderstanding me, if the Miranda Warning was read as I am reading them to you, read to him, he doesn't read them, they are read to him by a policeman?
"A. I think he could understand.
"Q. You said a few minutes ago that they must be explained?
"A. I heard that they were explained.
"Q. You heard?
"A. Yes. Let's assume they were not explained to him, I would say that could be put to him in such a way, read coldly, using only those terms, there might be a borderline case in that situation, if they were read and not explained.
"Q. Now, say that again.
"A. I said if they were read without any explanation, without any modification it might be difficult for him to understand them word for word as you were putting them, you are taking one word out at a time."
After the defense had rested its case, the State called two witnesses to testify in rebuttal. Both witnesses testified to the defendant's degree of mental retardation. Dr. Smith's testimony was substantially the same as that which he had given during the hearing on the voluntariness of the confession.
Dr. Edwin C. Seeger did not testify at the voluntariness hearing but was called by the State in rebuttal after the defense had rested its case. He was a clinical psychologist at Bryce Hospital in Tuscaloosa and was a member of the Forensic Unit or "lunacy commission" which found the defendant competent to stand trial.
Based on his personal observation and his study of the defendant's mental history, his conclusion was that the defendant was mentally retarded: "It was obvious to me that he was retarded and that I would have to explain things more thoroughly than I usually do to normal functioning patients."
Dr. Seeger testified as follows:
"... [H]is IQ was approximately at 39, but, from observing him we knew he had additional skills, a lot more advanced than the 39 IQ would, ... I decided that the IQ figure was not an indication of his functioning level, I needed to give him another test. So, a social test was given him that goes to his IQ, but, also goes to such things as self-help skills and social skills, communication and occupational skills, which I gave him, that came out with the raw score of ninety, a mental age of 15 years and 5 months."
* * * * * *
"Then sometimes after that we received his records from the Cherry Street School and I reviewed those records and those records more or less confirmed the fact that although he had a low IQ, that he was functioning at a much higher level than it measured.
"Q. Based on your observations and testing that was done there and the data, I believe you said it was your findings that he had a mental age of 15 years and 5 months?
"A. Yes. That was more indicative of his total functioning than the IQ score of 39, which would place him in the 7 or 8 year old range."
*1179 Dr. Seeger also concluded that the defendant could understand his constitutional rights if they were explained to him.
"A. In my opinion, if the rights on that sheet were just read to him, as you would read to a normal person, he would not be able to understand it. However, if they were explained.
"MR. MIMS [Defense Counsel]: I object to the latter part.
"THE COURT: Overruled.
"A. However, if they were explained to him, some of the words in there are large three syllable words, if they were broken down to where a person, a teenager could understand them, yes he could understand."
With regard to Miranda, Dr. Seeger further stated:
"If the Miranda Rights were read to him and explained to him, in other words, some of the abstract words on the Miranda decision were broken down into terms that he could understand, there would be no problem of understanding his rights.
These abstract words would have to be "broken down" to "a functional level of 15 years", according to Dr. Seeger:
"Q. And you had estimated that he could understand the Miranda Warning[s] and make a knowing waiver, if they were explained to him, is that not so, sir?
"A. Yes.
"Q. How would this explanation as to what type of explanation would have been necessary, sir?
"A. The explanation would have to be in more concrete rather than abstract terms.
"Q. Would you give an example to the Jury, sir?
"A. Well, when he got down to where he could pick out the word that needed to be defined, you could just read him, one of the sentences and he could point to the word, point to the word out that would need explanation, like his right to talk to a lawyer for advice before we ask you any questions and have him with you during questioning, I don't think he would know the word advice, the term advice would have to be explained, rather.
"Q. What about, sir, during questioning?
"A. I think he might understand what questioning is.
"Q. The phrase you have the right?
"A. I believe that he understands what rights he has.
"Q. No, we are talking about the phrase, sir?
"A. I believe he knows that right, you have the right, I believe he would understand that.
"Q. Constitutional right?
"A. Perhaps not constitutional right.
"Q. Could he possibly think it was the right arm?
"MR. MOEBES: Objection.
"THE COURT: Overruled.
"A. Not in the context.
"QUESTIONED BY MR. HAIRSTON:
"Q. Not in that context? If you cannot afford a lawyer, one will be appointed for you if you wish, what about that one, sir?
"A. That would also have to be broken down.
"Q. Alright. What words would have to be explained and defined to the Defendant in order for him to understand that, sir?
"A. Afford, for one, I don't think he would know what the word afford would mean, if you can't pay, something like that. Also the word lawyer, when asked if he wanted to talk to the attorney, he knew what a lawyer was when I talked to him.
"Q. How do you know that he understood?
"A. Well, we are getting back to what we talked about earlier.
"Q. What did he say to you that indicated that he understood what a lawyer was?
"MR. MOEBES: Objection to that as being repetitious.
"THE COURT: One more time, Mr. Moebes.
"A. When I was talking to him about a lawyer and the fact that when a lawyer *1180 came to see him and we told him that there was a lawyer out there to see you, one that was sent to Tuscaloosa by a black organization to see him, he knew that was the lawyer.
"QUESTIONED BY MR. HAIRSTON:
"Q. I am trying to pin it down as to how he indicated that you knew, sir?
"A. By his behavior.
"Q. His behavior, he didn't tell you that he knew?
"A. When I talked to him he said yes, you are getting into that same log jam.
"Q. I am going to move on, I had one crack at that one, I believe. Now, to the warning, the next warning, if you decideif you decide to answer questions now without a lawyer present you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer. Are there any abstractions in that, abstract concepts?
"A. I don't think you would have to change decide, if you wanted to ask him questions, talk to him normally, more or less, street language, rather than legal language.
"Q. Alright. What about the waiver of rights, would he understand waiver of rights, sir?
"A. Not unless they were explained to him.
"Q. The word waiver, would have to be explained, sir?
"A. Yes.
"Q. Did you explain to the Defendant what a lawyer was, sir, do you recall?
"A. No, I didn't have to, he seemed to know what a lawyer was, when I talked to him, I had to change the word attorney, he had a puzzled look, I changed it to lawyer, he seemed to know what a lawyer was.
"Q. So, in other words, your testimony is that he could understand the Miranda Warning and waiver only if certain words were explained to him in such a manner that he could understand, is that your testimony, sir?
"A. Yes, sir."
Dr. Seeger stated that the stressful situation surrounding the defendant's being placed in and interrogated in police custody would inhibit his intellectual functioning "to a degree."
The transcript of the hearings to determine the voluntariness of the confessions consumes a large portion of the voluminous record on appeal. We have omitted most of the testimony given at those hearings and focused on those portions most determinative of the voluntariness question.
The Alabama Supreme Court recently stated the law governing the determination of voluntariness of a confession given by a mentally retarded defendant:
"Thus, in most cases, the defendant's mental deficiency will be but one factor to be considered in the `totality of the circumstances' surrounding the confession. In some cases, however, it may be the most important or controlling factor. See e. g. Dover v. State, 227 So.2d 296 (Miss.1969); People v. Langston, 57 Mich. App. 666, 226 N.W.2d 686 (1975). See also Redwine v. State, 258 Ala. 196, 61 So.2d 724 (1952). The importance of this factor increases with the degree of the accused's mental retardation because he must be able to understand his right to remain silent and to an attorney before he can waive them. It is a knowing and intelligent waiver that is required. Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)."

Garrett v. State, 369 So.2d 833, 836 (Ala. 1979).[5]
In Garrett the defendant was mentally retarded with an I.Q. of 50. The court held, "Although such a degree of mental retardation in a given case may be controlling, we need not so hold here because we find from the totality of the circumstances that the confession was involuntary." Garrett, 369 So.2d at 836.
*1181 The testimony and facts of this case dictate that the most important and controlling factor to be considered in the totality of the circumstances is the defendant's mental deficiency. We need not cite a long list of cases stating the general principles on the mental subnormality of the accused as affecting the voluntariness or admissibility of a confession. These principles were concisely and efficiently stated in Garrett. Cases touching this issue have been collected in the annotation at 69 A.L.R.2d 348 (1960). In addition, this question has repeatedly been faced by the courts of this state. Jackson v. State, 375 So.2d 1271 (Ala.Cr.App.), cert. denied, 375 So.2d 1274 (Ala.1979); Twymon v. State, 358 So.2d 1072 (Ala.Cr.App.1978); Parker v. State, 351 So.2d 927 (Ala.Cr.App.), cert. quashed, 351 So.2d 938 (Ala.1977); Arnold v. State, 348 So.2d 1092 (Ala.Cr.App.), cert. denied, 348 So.2d 1097 (Ala.1977). Yet in none of these cases has there existed a mental deficiency so extensive as the defendant's. We have diligently searched and have been unable to find any case involving mental retardation and the voluntariness of a confession wherein the degree of mental retardation was as extreme as that presented here.
The United States Supreme Court has repeatedly recognized that a confession made by a person whose verbal intelligence is limited is more likely to be involuntary. Sims v. Georgia, 389 U.S. 404, 407, 88 S.Ct. 523, 525, 19 L.Ed.2d 634 (1967); Culombe v. Connecticut, 367 U.S. 568, 624-25, 81 S.Ct. 1860, 1890-91, 6 L.Ed.2d 1037 (1961); Fikes v. Alabama, 352 U.S. 191, 196, 198, 77 S.Ct. 281, 284, 285, 1 L.Ed.2d 246 (1957); Jurek v. Estelle, 593 F.2d 672 (5th Cir. 1979).
The "suggestibility" of the defendant must also be considered:
"The Supreme Court has said that in deciding whether a confession is voluntary we must `[weigh] ... the circumstances of pressure against the power of resistance of the person confessing,' Stein v. New York, 346 U.S. 156, 185, 73 S.Ct. 1077, 1093, 97 L.Ed. 1522 (1953), and has held confessions to be involuntary partly because of the unusual suggestibility of those who gave them. See Culombe v. Connecticut, 367 U.S. at 625, 81 S.Ct. 1860; Fikes v. Alabama, 352 U.S. at 198, 77 S.Ct. 281. See also United States v. Lehman, 468 F.2d 93, 100 (7th Cir.), cert. denied, 409 U.S. 967, 93 S.Ct. 273, 34 L.Ed.2d 232 (1972)."
Jurek, 593 F.2d at 677.
Whatever definition of voluntariness we employ, Jurek, 593 F.2d at 676, it is clear from the record that the defendant could not have knowingly and intelligently waived his constitutional rights without adequate explanation. See Cooper v. Griffin, 455 F.2d 1142 (5th Cir. 1972). Proof of that explanation is missing from this record. When expert testimony indicates that a defendant could have intelligently understood the waiver of his constitutional rights only if they were simply and clearly explained, the record must expressly and specifically establish that such an explanation was given. See Davis v. Henderson, 473 F.2d 679 (5th Cir. 1973).
"The requirement of `knowing and intelligent' waiver implies a rational choice based upon some appreciation of the consequences of the decision." Cooper, 455 F.2d at 1146. The record demonstrates that the defendant had no appreciation of the options before him or the consequences of his choice. It is virtually undisputed that the defendant could not understand all of the words in the Miranda warning. Consequently, we conclude that the defendant could not have made a "knowing and intelligent" waiver of his constitutional rights. The confessions were therefore inadmissible. Their admission deprived the defendant of his constitutional rights of due process of law and a fair trial. His conviction must be reversed.

II
Dr. Smith testified as a rebuttal witness for the State. Qualified both as a psychiatrist and an attorney, Dr. Smith stated that the defendant could "function sexually."
On recross examination of Dr. Smith by defense counsel the following occurred:
*1182 "Q. Have you observed Mr. Hines performing a sexual act, sir?
"A. No.
"Q. Have you observed Mr. Hines' genitalia, at all, sir?
"A. Yes, not by physical examination, but.
"Q. That is what I mean, observe with your eyes, with your eyes, sir, did you make a physical observation and examination of the Defendant's genitalia?
"A. I did in this courtroom, I saw that he had an erection one time.
"MR. HAIRSTON: Objection.
"THE COURT: Overruled.
"A. You asked, I don't know.
"QUESTIONED BY MR. HAIRSTON:
"Q. I was asking during your examination?
"A. You asked me about an examination.
"Q. I am not personallyI asked you had you ever observed his genitalia during your examination?
"A. You asked me if I observed here.
"QUESTIONED BY MR. HAIRSTON:
"Q. You knew what I asked you.
"A. I don't know, you were asking me."
Immediately after this exchange, the trial court recessed the jury and requested an apology from defense counsel for his loss of "total composure."
When the jury returned, defense counsel apologized for his outburst and the trial judge, of his own initiative, carefully instructed the jury to disregard the answer, "to erase it from your mind" and "not utilize it for any purpose." The judge polled the jury and no juror indicated that he could not comply with the court's instructions. As in Stain v. State, 273 Ala. 262, 266, 138 So.2d 703, 706 (1962), it must be recognized that "if the situation was curable by admonition, the instructions were adequate for that purpose." Later, defense counsel requested a mistrial based on Dr. Smith's answer.
The State contends that the answer was responsive to the question of defense counsel. However, the record reflects that the answer was totally unresponsive and volunteered.
In Stain, 273 Ala. at 266, 138 So.2d at 706, the Alabama Supreme Court addressed the issue we now face.
"The decision of the question as to its eradicability is a delicate operation. It requires recognition of, without definitely drawing, the imponderable line where the broad legal discretion lodged in trial courts ends and the more objective review of appellate tribunals begins. Furthermore, the doctrine of harmless error must be given full play. The purpose of the doctrine is to cast upon the party complaining of technical or procedural errors the burden of showing that they have substantially affected his legal rights. In such cases, there is always the possibility, often the probability, that the prejudicial statement entered into the judgment, and the harmless error rule is not intended to save such a verdict from appellate condemnation."
We are left in grave doubt as to whether or not the jury was humanly able to follow the trial court's instructions to erase and disregard Dr. Smith's answer. In view of such doubt, the conviction cannot stand. Stain, 273 Ala. at 266, 138 So.2d 703.
Dr. Smith's answer was clearly unresponsive, illegal and irrelevant for any purpose in this case. Unquestionably, the remark was extremely prejudicial. It was given by one trained in the law and accustomed to testifying as a witness. It went to the merits of the defense and related to a material fact in issue. The "circumstances indicate more than a possibility that appellant's legal right to a fair trial was substantially impinged by the incompetent and prejudicial testimony." Stain, 273 Ala. at 267, 138 So.2d at 707. We do not think that the explosive and prejudicial effect of this remark can be exaggerated or overestimated in the context of this particular case.

III
In examining the defendant's brother, Billy Hines, defense counsel questioned *1183 the witness about his attempt to find out the whereabouts of the defendant on May 23rd. The trial court sustained the objections of the State and did not allow defense counsel to make an offer of proof. This was reversible error. Fields v. State, 382 So.2d 598, Ala. (1980), relying on White v. State, 48 Ala.App. 111, 262 So.2d 313 (1972), and Sellers v. State, 7 Ala.App. 78, 61 So. 485 (1919).

IV
In granting the defendant's motion for a change of venue and moving the trial from Morgan County to Cullman County, the Circuit Judge issued a written order which describes the conditions of the time. We quote a portion of that order:
The sworn motion is evidence in itself as an affidavit. It verifies, among other things:
"`The facts of the race of the defendant and victims have so overshadowed the case as to make it appear to the community as a racial incident.... Several groups, motivated by the racial aspects of the case have been marching, demonstrating, holding rallies and erecting camps upon the courthouse grounds and other facilities within the community which has had the result of polarization between the races in the Morgan County community.... [L]ocal newspaper and radio stations have through their extensive broadcasts and publications greatly increased the prejudice ...'
"The Court has observed much of this evidence itself first-hand. Such incidents have occurred with some regularity within sight of the courthousemany times in view of the Court itselfsince last spring. These incidents continue. Some have resulted in arrests, convictions, and appeals. Other criminal charges growing out of these incidents are still pending.
"Media coverage has been almost continuous from the first. It reflects two racially identified political organizations commonly referred to as SCLC and KKKboth using this case as a rallying point for their opposing viewseach seeking as much publicity as possible to increase membership. These activities have resulted in the gathering of crowds estimated in the thousands.
"Media also reflect that the leader of one of these factions is from the state of Georgia and the other is led by a man from Louisiana. Followers have been brought to the city of Decatur in bus loads.
"The result of this has been to turn Morgan County into a battleground of opposing political thought. The tactics have been political action in the streets and public places. The cases against the defendant have been the weapons used by each side in their war against each other.
"Each side appears to have sought to persuade every available mind of the guilt or innocence of the defendant before he is ever tried.
"This is an intolerable result.
"It is almost inconceivable that there are prospective jurors who have not heard of or discussed these incidents or the cases.
"Any man or womanblack or white required to sit as a juror on any of these cases would be victimized by [the] present atmosphere to such an extent as to have questions in the mind about his or her own impartiality.
"Such a jury could not serve in the interests of justice. Neither could it serve in the interests of itself, the State, nor the defendant. It could not in law be called impartial."
From the record we note that some of these conditions were present during the defendant's trial in Cullman County. The trial judge repeatedly had to admonish the courtroom spectators to remain silent and refrain from any outbursts or disruptive conduct. At one point the trial was interrupted and the courthouse evacuated because of a bomb threat. Extensive security precautions were necessitated in order to insure the personal safety of the courtroom participants. Defense counsel were subjected to intimidating remarks and racial slurs upon entering and leaving the courthouse.
*1184 These comments are made in light of our decision reversing the defendant's conviction and remanding the case for a new trial. Should the trial judge find that the defendant cannot get a fair trial in Cullman County, a change of venue must be granted. The statutory restrictions of Alabama Code 1975, Section 15-2-24, allowing only one change of venue, cannot be construed as operating to deny an accused his constitutional right to a fair trial. Additionally, we do not think that the restriction of that statute was meant to apply in such a situation as here presented where the case is reversed on appeal and remanded for new trial.
The conviction of the defendant is reversed and the cause is remanded for a new trial for the reasons we have stated in this opinion. Regardless of his race or the crime with which he is charged, an accused must receive a fair trial. This Court will not tolerate anything less. In the most basic and fundamental sense of the term, the defendant was denied that right.
REVERSED AND REMANDED.
All Judges concur.

ON REHEARING
BOWEN, Judge.
On application for rehearing the State challenges parts I and II of our opinion. No issue is made on part III and IV.
In reaching the conclusion that the defendant did not have the mental capability of understanding the Miranda warnings read to him without additional explanation and, therefore, did not rationally and intelligently waive his constitutional rights, this Court did consider the totality of the circumstances surrounding the confession. After reviewing the entire record, we found the defendant's mental deficiency to be the most important and controlling factor of all the circumstances. See People v. Bruce, 62 A.D.2d 1073, 403 N.Y.S.2d 587 (1978). "[T]he concept of `voluntariness' is one which concerns a mental state." Culombe v. Connecticut, 367 U.S. 568, 603, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961).
Part II of our opinion concerns the prejudicial quality of Dr. Smith's volunteered testimony at trial. To the original opinion, we only add that within the context of this particular case we consider his answer analogous to the stone which once hurled can never be recalled.
The State presents no argument which we have not already considered in writing our opinion. We remain firm in our conviction that the defendant was denied a fair and impartial trial. Therefore, the application for rehearing is overruled.
OPINION EXTENDED; APPLICATION FOR REHEARING OVERRULED.
All the Judges concur.
NOTES
[1] After examining the application form, Officer Russell gathered that the defendant might not be literate. On the form the defendant wrote his name, "TOMMYINESH;" listed other training, "509M;" his present employer, "509M;" his employer's address, "509DdA;" and his title, "509DbM." On one page the defendant had written "509MDdiNESH" upside down.
[2] According to Officer Russell, the description was "[a] black male, approximately 5'6" to 5'7, 19 to 23 years of age, rather closely cropped hair, clean shaven and a full mouth of [prominent] white teeth." A physical examination of the defendant at Bryce Hospital revealed that the defendant weighed 143 pounds, had a height of 5'2", and was 25 years old. A police photograph of the defendant shows that he does have "white teeth" and "rather closely cropped hair."
[3] Officer Russell further stated:

"He was sitting in the car and I was standing there and I asked him would you go down to City Hall and talk to two detectives. I remind you again that you don't have to say anything, anything you say can be used against you, you have the right to have an attorney with you and do you understand."
[4] Officer Russell testified that the defendant was not under arrest and he "most certainly" would have let the defendant get out of the police car and leave if the defendant had said he wanted to go home.
[5] The record indicates that in arguing for the voluntariness of the defendant's confession, the State cited this case to the trial judge.