473 So.2d 471 (1985)
Everett CARTER
v.
STATE of Mississippi.
No. 55616.
Supreme Court of Mississippi.
July 24, 1985.
*472 Franklin J. George, Grenada, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by Charles W. Maris, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before ROY NOBLE LEE, P.J., and DAN M. LEE and ROBERTSON, JJ.
DAN M. LEE, Justice, for the Court:
The Circuit Court of Grenada County found the appellant, Everett Carter, guilty of aggravated assault and sentenced him to sixteen (16) years in the custody of the Mississippi Department of Corrections. He appeals this conviction and sentence, and we reverse and remand.
On September 25, 1983, Mrs. Willie Mae Tanner, a 73-year-old woman who lived alone in Grenada, surprised an intruder in her kitchen. The intruder, whom she later described as a heavy set black male, grabbed her from behind as she entered her kitchen. He began to choke her, in the *473 process knocked her glasses off, and then ordered her to remove her pants and her panties. During this time he was holding a knife to her throat. After she removed her pants and her underwear, the assailant ran the knife up her vagina. He cut her there, and also made about a foot long gash in her leg. He threw her to the floor, hit her on the head with two different cast iron skillets, and stomped up and down on her back and and stomach. He also broke a glass over her head. She begged her attacker not to kill her, and offered him money if he would leave her alone. The intruder then carried Mrs. Tanner to her living room, where he took money that she offered him, and left.
The attack left Mrs. Tanner with multiple injuries. These included: cuts to the front of her neck, and a long cut down her right leg; bruises and cuts around the skull and facial area; nine broken ribs; and a large bruise on her abdomen which resembled a footprint. Mrs. Tanner's doctor did not examine her vaginal area. The injuries which Mrs. Tanner received required approximately thirteen (13) days of hospitalization.
On October 1, 1983, Grenada County Deputy Sheriff Robert Shields received a call to go to a local cabinet shop owned by Paul Wilburn. Mr. Wilburn had complained that Everett Carter, a young man who lived nearby, had been going through an ice box which was located in the back of the shop. Deputy Shields first went to Mr. Wilburn's cabinet shop, and then to the home of Carter's grandparents. Shields picked up Carter at his grandparents' home, and took him to the place of business of a justice court judge in Grenada County. There, Shields signed a general affidavit which stated that Carter "Did willfully and unlawfully disturb the peace by going to the shop belonging to Paul Wilburn on Sweethome Road." The judge then signed a warrant charging Carter with disturbing the peace. He was arrested and taken to the Grenada County jail.
Since Carter could not make bond, he remained in jail until October 3, 1983. On that day, his grandparents signed an affidavit and application for commitment for mental treatment. The affidavit alleged that Carter had trespassed on Paul Wilburn's property and also at various eating establishments where he annoyed the customers and manager. It also alleged that he tore his clothes up, and that he urinated in his closet. Further, it alleged that he had attempted to hit his grandfather. Upon this application, Carter was transported to Region 6 of the Mental Health Center, Greenwood, Mississippi. A clinical psychologist, Dr. John M. Fitch, and a medical doctor, Dr. Robert McKinley, evaluated Carter. They did not recommend involuntary commitment, but behavior management training. They did allege that Carter appeared to be mildly retarded, although there was no indication of psychosis. Everett Carter was subsequently returned to the Grenada County jail.
Also on October 3rd, Carter caught the attention of Deputy Sheriff C.H. Lovorn. Deputy Lovorn was investigating the assault on Mrs. Tanner, and he noticed that Carter fit the general description of the attacker. Deputy Lovorn then checked the jail docket, and discovered that Everett Carter was in jail on a disturbance charge. He also discovered the word "mental" written on the charge on the jail docket. Lovorn took a photograph of the defendant, with the intention of showing it to Mrs. Tanner for purposes of identification. The photograph shows Everett Carter as a young heavy set black male. It also shows him with his mouth open and his tongue partially sticking out. The other photographs which were included in the lineup also show young black males, but none so heavy set as Carter. Detective Lovorn took the set of pictures to Mrs. Tanner in her hospital room. While Mrs. Tanner did not make a positive identification of Carter, she picked out his picture from the group of pictures and indicated that he could have been her attacker. Everett Carter was then charged with the aggravated assault of Willie Mae Tanner.
*474 On October 4, 1983, Deputy Sheriff Donald E. Lawrence of Grenada County began talking to Everett Carter about the crime. He first gave Carter his Miranda warning, which Carter signed. Lawrence was of the opinion that Carter fully understood his rights. Lawrence first began talking to Carter about the incident for which he was arrested. Then, Lawrence asked him why he went into "the white lady's house." Carter then made a statement to Lawrence and to C.H. Lovorn, who was also present. In the statement, Carter admitted that within the last few weeks, he had entered a house by way of a back door which was cracked open. He stated that while in the house, he was discovered by "an old white woman Caucasian." He stated that he then became frightened, and ran into the woman on his way out of the house. He also stated that he picked up some change which he found in the house on his way out. According to Carter, he ran away from the woman because she was holding a knife. He said that he stepped on the woman after he knocked her down, but that he did not remember cutting her with a knife and did not think that he did. The statement does not represent an exact quote from Everett Carter, but a paraphrasing of his statement to Deputy Lawrence.
Carter was brought to trial on January 30, 1984. On January 26, 1984, Carter's attorney had subpoenaed Dr. Robert McKinley from the Mental Health Center at Greenwood to testify in the trial. Dr. McKinley was not present at the trial, and Carter's attorney moved for a continuance to compel his presence. His attorney told the court that Dr. McKinley's testimony was necessary in order to assist in the defense of insanity, and also to testify about drugs that the defendant was taking, and their possible effect on his ability to give a statement to the sheriff. Counsel for the state submitted to the court a letter written by Dr. McKinley, in which he evaluated the defendant's condition. The letter stated that Dr. McKinley was of the opinion that Carter was competent to stand trial, and was responsible for his actions. According to Dr. McKinley, Carter possessed "borderline intellectual functioning." Dr. McKinley also alluded to probable psychosis on the part of the defendant, but, in McKinley's opinion, that psychosis had nothing to do with the crime. The court overruled the defendant's motion for a continuance.
A motion by the defendant to suppress his statement was heard in the judge's chambers prior to trial. In addition to various law enforcement officers previously mentioned, the court took testimony from Lewis Thompson, Deputy Sheriff and Administrator of the Grenada County jail. Johnson testified that he had regularly administered two prescription drugs to Everett Carter during the time he was incarcerated. Those two drugs were Cogentin and Haldol. The prescriptions were filled and the drugs administered after Carter's visit to the Mental Health Center on October 3rd. The court also heard from Jerry Lucius, a law enforcement officer for the City of Grenada. Officer Lucius interviewed Willie Mae Tanner at Grenada County Hospital shortly after her attack. It was he who received the description from Mrs. Tanner of her attacker as a heavy set black male.
Carter's grandparents also testified at this hearing. His step-grandfather, Rev. John Evans, testified that the 22-year-old Carter had been living with them for approximately ten (10) months. Carter previously lived in Detroit with his mother, where he had been institutionalized. Evans testified that Carter's mental deficiency manifested itself in an insatiable appetite, and that they had problems with Carter stemming primarily from his desire to eat. Evans testified that he and his wife often found Carter in the kitchen attempting to prepare food, and when he was caught, he attempted to cover up his deeds. Evans testified that there were times when Carter appeared not to know what he was doing. He also testified that there was a noticeable difference between Carter's behavior when he was on medication and when he was not on medication. Mrs. Evans, *475 Carter's grandmother, also testified that Carter had been in a mental institution in Detroit for approximately two (2) or three (3) years. She testified that Carter's behavior was often childish, including a continuing practice of urinating in his closet.
Mrs. Tanner also testified at the hearing. She was asked if she recognized her assailant in the room and she testified that she could not swear that she did. Detective Lawrence testified, and he was asked about Carter's confession. He testified that he believed Carter understood the questions and knew what he was saying. He also testified that Carter had admitting going into Mrs. Tanner's house for the purpose of getting food. Deputy Lovorn testified, and he stated that Carter did not appear, at the time of his confession, to be under the influence of drugs.
The court overruled the motion for the suppression of the confession, finding that, even if the arrest were illegal, there were sufficient intervening circumstances.
At trial, the testimony was roughly the same as in the hearing. Deputy Lawrence did testify at trial that, during the time that Carter was making his statement, he appeared to be slow and rather dim-witted. Rev. Evans, when called for the defense, testified that the defendant had no violent tendencies at home. Carter's grandmother, Mrs. Evans, also testified to his lack of violent tendencies, and testified that, in her opinion, Carter had a mental age of about six (6) years. Additionally, she testified that Carter gets confused under stress.
At the close of the trial, the judge refused two instructions related to Carter's insanity defense. The jury found the defendant, Everett Carter, guilty of aggravated assault, and he was sentenced to sixteen (16) years.

FAILURE TO GRANT A CONTINUANCE
The defendant's first assignment of error relates to the failure of the court to grant a continuance so that Carter could compel the attendance of Dr. McKinley at trial. It is well established in Mississippi that trial judges have broad discretion in granting a continuance. Greene v. State, 406 So.2d 805 (Miss. 1981); Norman v. State, 385 So.2d 1298 (Miss. 1980). That discretion is authorized by Miss. Code Ann. § 99-15-29 (1972). However, that section states that,
"A denial of the continuance shall not be grounds for reversal unless the Supreme Court shall be satisfied that injustice resulted therefrom."
Dr. McKinley stated in his letter that, in his opinion, the defendant was competent to stand trial. However, counsel for the defendant also requested Dr. McKinley's presence in order to elicit testimony regarding the drugs which Carter was taking. These drugs, which were described in Dr. McKinley's letter as being major tranquilizers, could have had a significant effect on Carter's ability to give a statement. Testimony from a medical doctor would have gone far to clear up this issue, particularly in light of testimony that there was a noticeable difference in Carter after he took the drugs. For this reason, the failure to grant a continuance resulted in manifest injustice to the defendant.
Everett Carter was entitled to present to the jury evidence regarding his mental capacity at the time he gave his statement to the police, and the lack of evidence unfairly prejudiced him.
Incompetent evidence ... is presumed to have been harmful, and it is only when we can say with confidence that it had, in all probability or likelihood no such effect that we may decline to reverse on account of it.
Wood v. State, 257 So.2d 193, 200 (Miss. 1972), quoting Coleman v. State, 198 Miss. 519, 522, 23 So.2d 404, 405 (1945).
In this case, we deal not with incompetent evidence, but with lack of evidence. We cannot say with confidence that the lack of expert testimony as to Carter's mental capacity and the influence on him of the tranquilizers he was taking did not have a *476 harmful effect. Dover v. State, 227 So.2d 296 (Miss. 1969).
The defendant in this case appears to have used due diligence in attempting to procure the attendance of Dr. McKinley at trial. For that reason, a continuance should have been granted, Dobbs v. State, 96 Miss. 786, 51 So. 915 (1910), and the refusal to do so was reversible error.
Carter also assigned as error the failure to allow him the defense of insanity and that the verdict was against the overwhelming weight of the evidence. Because we reverse on the failure to grant a continuance, we find it unnecessary to reach these assignments of error.
We do reach the defendant's third assignment of error, however, for the reason that it is closely tied to the first assignment of error, and that the question will arise again on remand. Carter's third assignment of error was that his confession was inadmissible because it was tainted by an illegal arrest.
The court below recognized the possibility that the initial arrest of Carter may have been illegal and noted the factors to be considered to determine if the resulting confession was, in fact, admissible. Those factors, initially articulated by the United States Supreme Court in Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), and applied by this Court in Hall v. State, 427 So.2d 957 (Miss. 1983), include: (1) The temporal proximity of the arrest and the confession; (2) the presence of intervening circumstances; (3) the purpose and flagrancy of the official misconduct, i.e., the making of the illegal arrest; and (4) any other circumstances that seem relevant. 427 So.2d at 959-60. In determining whether to apply those factors, the threshold question is, of course, whether the initial arrest was illegal. In this case, Carter was arrested upon a general affidavit which stated that he "Did willfully and unlawfully disturb the peace by going to the shop belonging to Paul Wilburn on Sweethome Road." Deputy Shields testified that this alleged illegal activity did not take place in his presence. Therefore, he had no personal knowledge of the event, and he did not detail what he related to the justice court judge who issued the warrant. The affidavit itself states merely a conclusion without any indication as to who had personal knowledge of the event. While the information may have been obtained from reliable sources, there is nothing on the face of the affidavit to so indicate. See Read v. State, 430 So.2d 832, 834-35 (Miss. 1983); Lee v. State, 435 So.2d 674, 677 (Miss. 1983). The affidavit, and, thus, the warrant, may be inadequate, making Carter's arrest illegal.
Assuming, but not deciding, that Carter's arrest was illegal, his confession must satisfy the criteria set forth in Brown v. Illinois. The first factor to be considered is the temporal proximity of the arrest and the confession. In this case, Carter was arrested on October 1st and he gave his confession on October 4th. That is sufficient time, in the words of Hall v. State, "To become acclimated to his surroundings." 427 So.2d at 960-61. The second factor is the presence of intervening circumstances. The trial court found two intervening circumstances in this case; first, that he was taken to a magistrate immediately after his arrest and bond was set; and second, that two days after his arrest, he was taken to Greenwood, Mississippi for psychiatriac evaluation. These intervening circumstances would tend to separate Carter's confession from the "exploitation of [his] arrest." Johnson v. Louisiana, 406 U.S. 356, 365, 92 S.Ct. 1620, 1626, 32 L.Ed.2d 152, 161 (1972). The third factor is the purpose and flagrancy of the official misconduct, that is, the making of the illegal arrest. In this case, Deputy Shields appears to have acted with both dispatch and restraint, and Carter's arrest can hardly be said to have been flagrant. The fourth factor is any other circumstances that seem relevant. It is our opinion that the other circumstances of this case do not require suppression of Carter's confession. Therefore, it will be admissible in any subsequent trial, although Carter should be allowed to present evidence as to *477 his mental state when he made it. See Dover, supra.
We hereby reverse this case and remand to the Circuit Court of Grenada County for a new trial.
REVERSED AND REMANDED.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and HAWKINS, PRATHER, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.