Petitioner, Jimmie Lee Garrett, Jr., was convicted of the first degree murder of Mrs. Eunice Mae Lunsford and was sentenced to life imprisonment. He appealed to the Court of Criminal Appeals, which affirmed. We granted certiorari to review the following issues:
(1) Whether a search of Garrett's residence by police officers was constitutional;
(2) Whether Garrett made a knowing and intelligent waiver of his constitutional rights such that his resulting confession was voluntary; and
(3) Whether the trial court erred in charging the jury concerning the felony-murder doctrine.
 I.
Mrs. Lunsford, age 75, was found dead in her bathtub on 27 July 1976. There were several cuts and bruises on her face and the cause of death was attributed to a heart attack resulting from those injuries. The Birmingham Police Department obtained from the deceased's son, Robert E. Lunsford, a list of items missing from his mother's home and a list of persons who would have occasion to have been there. Garrett's name was on that list since he often cut the grass and did other chores for Mrs. Lunsford. Based on this information two officers went to Garrett's house to ask him routine questions about his whereabouts on the day of Mrs. Lunsford's death. Garrett, who was 17 at the time, met them at the door and allowed them to enter.
At this point the evidence is conflicting. According to the officers, Garrett and his father gave them permission to search the house. According to Garrett's father, he gave his permission only after the officers threatened that he "would be just as much involved" in it as was his son if he didn't allow them to search the house. The officers searched Garrett's bedroom and found several items which were listed as missing from the deceased's home.
Garrett contends the consent to the search was not freely and voluntarily given. *Page 835 
Without such consent the search would be unconstitutional because the officers did not have a search warrant. The circumstances would not justify a departure from the general rule that a person's home may not be searched without a search warrant or permission. Duncan v. State, 278 Ala. 145,176 So.2d 840 (1965).
The Court of Criminal Appeals held that the trial court to be in the best position to determine whether consent had been voluntarily given. After examining the evidence the appeals court held the trial court did not abuse its discretion.Garrett v. State, 369 So.2d 827 (Ala.Cr.App. 1978). Although the evidence presented regarding this issue was irreconcilable, we agree that in this case the trial court could properly find consent was freely and voluntarily given. See Holmes v. State,342 So.2d 28 (Ala.Cr.App. 1977).
 II.
After the incriminating evidence was found in Garrett's bedroom, his rights were read him and he was arrested. This occurred at approximately 10:10 a.m. After about an hour Garrett was taken to an interrogation room at city hall at sometime between 11:00 and 11:30 a.m., and interrogated until 4:05 p.m. at which time an unsigned confession was obtained from him. Garrett was given the Miranda warnings three times during the day and, according to the police, told them he understood his rights and wanted to talk to them. Garrett, however, was mentally retarded with an I.Q. of 56. He could neither read nor write and suffered from a speech impediment. The officers were aware of that as well as the fact that he was mentally slow.
Garrett contends that (1) he could not and did not make a knowing and intelligent waiver of his constitutional rights and (2) his confession was not voluntary. The Court of Criminal Appeals in addressing these contentions upheld the trial court's conclusion that Garrett was able to understand his rights and waive them and that his confession was voluntary. Although the court felt "an extremely close question" was presented, it could not find the trial court abused its discretion in admitting the confession. At the conclusion of the suppression hearing in this case the trial court made observations:
 "THE COURT: Limited mental capacity. I mean, what you have shown me is he's a person of low IQ. That is what you have shown me. I will find that as a matter of fact he has a low IQ and very low intelligence ratio. He may even be stupid. I don't like to use that word, but it is a word. He is probably stupid as we know it in the vernacular.
* * * * * *
 "THE COURT: * * * The only question I have difficulty with is this [sic] comprehending the Miranda decision. I have very serious doubt that this Defendant knew what Miranda rights, just saying that I doubt if he understood that. But when you go in and read to him — how many times were they given to him, twice or three times?
"MR. JOHNSON: Three times.
 "THE COURT: I'm talking about the word Miranda and constitutional rights. I doubt if he understood what that meant."
We agree this case presents a close question, but we are compelled to reach a different result from that of the appeals court.
This court as long ago as 1876 opined that the degree of intelligence of a prisoner should be considered in determining whether his confession was voluntary. Porter v. State, 55 Ala. 95
(1876) (going to admissibility). Cf. Seaborn v. State,20 Ala. 15 (1852); Brister v. State, 26 Ala. 107 (1855) (going to weight). In Elrod v. State, 281 Ala. 331, 334, 202 So.2d 539,542 (1967), this court stated that an
 "* * * [a]ccused's intelligence, character and situation at the time of the confession of the crime charged are important considerations in determining whether the confession was voluntary, but the fact that accused was of tender age or weak intellect will not alone render the confession inadmissible in *Page 836 
evidence as involuntary. State v. Ashdown, 5 Utah 2d 59, 296 P.2d 726, affirmed 357 U.S. 426, 78 S.Ct. 1354, 2 L.Ed.2d 1443. * * *"
Thus, in most cases, the defendant's mental deficiency will be but one factor to be considered in the "totality of the circumstances" surrounding the confession. In some cases, however, it may be the most important or controlling factor. See e.g. Dover v. State, 227 So.2d 296 (Miss. 1969); People v.Langston, 57 Mich. App. 666, 226 N.W.2d 686 (1975). See alsoRedwine v. State, 258 Ala. 196, 61 So.2d 724 (1952). The importance of this factor increases with the degree of the accused's mental retardation because he must be able to understand his right to remain silent and to an attorney before he can waive them. It is a knowing and intelligent waiver that is required. Miranda v. State of Arizona, 384 U.S. 436,86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
In this case we have a juvenile defendant who is mentally retarded to the point that he was classified by his teachers as trainable, but not educable. That is he can only be trained to take care of his daily needs. According to the teachers, he could not remember his class schedule from day to day. Nor could he understand any abstract words. For example, if Garrett were told he had a right to remain silent, he would not have understood what the word "right" meant and would probably not have understood what the words "remain" or "silent" meant. Two teachers testified that they did not believe Garrett would have understood the Miranda warnings. One of them testified Garrett would have said he understood the warnings, regardless of whether he did not or not, in order to please the interrogator.
Although such a degree of mental retardation in a given case may be controlling, we need not so hold here because we find from the totality of the circumstances that the confession was involuntary. Garrett was in the custody of the police for almost six hours. After being taken to city hall he was interrogated for four hours in a small room without counsel or any members of his family present; he was not fed during the interrogation and he was crying and sniffling.
Of particular importance is the fact that Mr. Lunsford, the victim's son, was allowed to question the defendant. Surely, the presence of a close relative of a murder victim during an interrogation would be calculated to frighten an accused person; a mentally deficient juvenile would be subject to tremendous pressure under such circumstances and might make statements simply as a result of that pressure.
Most indicative of the atmosphere in which the confession was made is the conversation between the police and Garrett prior to Garrett's formal statement. The conversation was recorded because the police tape recorder was accidentally turned on before it was intended to be. The tape was transcribed and the following portions are relevant to the voluntariness of Garrett's confession:
"(Sgt. A. Wallace:)
 Sergeant, why . . . let me interrupt you. My hearing is a little bad, and if you'll talk a little louder and start over again, I, I'm having trouble with my hearing. Tell me, tell me again.
"(Sgt. T.B. White:)
 Alright, let's go back now to get it straight because I've got to get it straight. Let me . . . okay. "(Sgt. Wallace:)
I won't write nothing down. (emphasis added)
* * * * * *
"(Sgt. Wallace:)
Talk a little louder now, I can't hear it, Jimmy.
 "A. I need to, something to blow my nose. My nose . . . need some toilet paper or something. My nose running.
"(Sgt. White:)
Q. Your nose is running?
"A. Yes, sir.
"Q. And you need some toilet paper.
"(Sgt. Wallace:) *Page 837 
 Okay, go ahead and I'll get you some in just a second. I, I want to hear this though.
"(Sgt. White:)
 These old people like he gets, he gets a little hard of hearing sometime so speak up.
* * * * * *
"(Sgt. White:)
 Q. Jimmy, the pocketbook is gone just like the other things. There was four items missing out of that house and you had three of them at your house. And one other little `ole, one insignificant thing about a purse, all we want is to get, get, find out where the purse is and that completely ends the whole thing. It's no evidence . . . it won't be any evidence against you. We've already got that. Just want a little . . . you remember when we talked awhile ago. (emphasis added)
* * * * * *
 "Q. You're already feeling better. I can see, you, you're not as nervous, you're not . . . chill bumps are gone and you're not sniffling or nothing. Alright, where was it?"
Self incrimination resulting from this type interrogation is what the Fifth Amendment to the Constitution of the United States and Section 6 of the Constitution of Alabama of 1901 were intended to prevent.
All confessions are prima facie involuntary and the state had the burden to prove otherwise. In this case it has failed to so do. Accordingly, we hold the confession inadmissible.
 III.
The indictment in this case states:
 "The Grand Jury of said County charges that, before the finding of this indictment, Jimmie Lee Garrett, Jr., whose name is otherwise unknown to the Grand Jury unlawfully, and with malice aforethought, killed Eunice Mae Lunsford by striking her on the head with a blunt instrument, or by means otherwise unknown to the Grand Jury, against the peace and dignity of the State of Alabama."
This language tracks the requirements of § 15-8-150 (72), Code 1975, which provides a form for an indictment charging a violation of § 13-1-70, Code 1975: murder in the first degree.
The trial court in its charge to the jury included instructions concerning the felony-murder doctrine. Garrett contends this was error because the indictment did not refer to the doctrine. Yet it did charge a violation of § 13-1-70. That section provides:
 "Every homicide perpetrated by poison, lying in wait or any other kind of wilful, deliberate, malicious and premeditated killing; or committed in the perpetration of, or the attempt to perpetrate, any arson, rape, robbery or burglary, or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed; or perpetrated by any act greatly dangerous to the lives of others and evidencing a depraved mind regardless of human life; although without any preconceived purpose to deprive any particular person of life, is murder in the first degree; and every other homicide committed under such circumstances as would have constituted murder at common law is murder in the second degree." (emphasis added)
Garrett cannot successfully maintain he had no notice that he was charged with felony-murder because it is included in the statutory definition of murder in the first degree.
Although it would have been preferable for the indictment to have been more specific, the fact that it wasn't does not create a fatal variance. Harvey v. State, 341 So.2d 187
(Ala.Cr.App. 1977); State v. Smith, 223 N.C. 457, 27 S.E.2d 114
(1943).
Because the confession in this case was unconstitutionally obtained and its admission was reversible error, the judgment of the Court of Criminal Appeals must, therefore, be reversed and the case remanded to *Page 838 
that court for decision not inconsistent with this opinion.
REVERSED AND REMANDED.
TORBERT, C.J., and BLOODWORTH, MADDOX, FAULKNER, JONES, ALMON, SHORES and BEATTY, JJ., concur.