Dorothy Scott was tried and convicted of "receiving stolen property in the first degree" in violation of § 13A-8-17, Code of Alabama 1975. She was later sentenced by the trial court to two and one-half years' imprisonment.
On January 30, 1980, Mike Beavers and Steve Leeth found some old silver flatware in a muddy plastic bag in a field behind the residence of Jack and Elizabeth Watson. Mike took the items to Mrs. Watson, who informed him that she did not know to whom the items belonged. While Mike was inside the Watson residence, Mrs. Watson or her child pulled open her silver chest under a table in the living room.
The next morning Mike and Steve and Steve's brother Doug Leeth sold for $5.00 the silverware that Mike and Steve had found. According to their testimonies in the trial court below, the three boys sold this old silverware to Dorothy Scott, the *Page 980 
appellant, owner and operator of the S S Jewelry Store.
Furthermore, the boys each testified that the appellant and her son, Joe Spell, explained to them the difference between silver plated items and sterling silver items and informed the boys that they would buy any additional items that the boys brought them. Consequently, the boys burglarized the Watson residence on two separate occasions, and removed sterling silver and silver plated items from the silver chest that Mike had seen earlier. After each burglary, the second perpetrated by the Leeth brothers alone, the boys took the items to the S 
S Jewelry Store and sold them to the appellant. The total value
of the items stolen by the three boys and sold to the appellant was over $5,000.00, but she paid the boys only about $185.00.
In her defense, the appellant testified that she had never seen the three boys before and definitely had not purchased any silverware from them. Appellant's husband, son, and daughter-in-law, each of whom was, allegedly, in the S S Jewelry Store during some portion of the appellant's negotiations with the three boys, also testified that they had never seen the three boys prior to trial.
On February 2, 1980, the day after the second burglary, the three boys confessed to Mr. Watson that they had stolen the silverware and had sold it to the appellant. That night, Mr. Watson and Doug Leeth went to the S S Jewelry Store where Doug asked the appellant to return the merchandise because it was stolen property. The appellant denied any knowledge of the silverware and asked Doug to leave.
A short time later, after Mr. Watson had contacted the authorities, Mr. Watson, two of his friends, the three boys, a police investigator and two uniformed policemen returned to the S S Jewelry Store to try and recover the stolen merchandise "before it could be disposed of." After banging on doors and windows for over 30 minutes, the officers telephoned the appellant and told her they were downstairs and needed to speak to her.
Mr. Watson and the police officers were soon greeted at the rear door by the appellant.
Mr. Watson and all three police officers testified that the appellant invited them into the store. One of the officers then explained what they were looking for and read the appellant theMiranda warnings. According to Mr. Watson and the police officers the appellant "voluntarily" suggested that they search the premises because she "had nothing to hide."
The appellant, her husband, and her son stated that she did not invite the searchers in and did not suggest a search of the premises. All three stated that they permitted the search without protest because they thought the appellant was already under arrest and consequently, that they had no choice.
Before the search was over, Mrs. Watson arrived and joined the police officers at their request. Shortly after her arrival, Mrs. Watson identified her "bon-bon" spoon which had been taken from her silver chest by the three boys. This identification was made in the presence of the appellant, her husband and her son. The "bon-bon" spoon was the only item belonging to the Watsons that was found and seized during this search. However, Mrs. Watson also identified in the same pile with the "bon-bon" spoon some of the old silverware that Mike Beavers had shown her and "allegedly" had sold to the appellant. (R. 121).
The "bon-bon" spoon was later introduced as evidence at trial and was again identified by Mrs. Watson (R. 124). A script letter, "W", which Mrs. Watson had had engraved on the spoon had been partially ground down when Mrs. Watson identified the spoon in the appellant's store. Before trial the remainder of the script "W" had been obliterated as a result of an attempt by the "crime lab" to raise the letter with chemicals. Mrs. Watson's in-court identification was possible because she recognized the "pattern" on the spoon, the places where the silver plating had been worn because of her constant peculiar
use *Page 981 
of the spoon as a "baby spoon", the ground area which was on the spoon when she saw it at the appellant's store, and the spoon's general appearance. (R. 138-140).
The appellant produced evidence to dispute Mrs. Watson's identification of the spoon. Appellant's daughter, Mary, testified that the "bon-bon" spoon seized during the search was hers. She and appellant's son, Joe, testified that at Mary's request, Joe had attempted to engrave a script letter "M" on the handle of the spoon but that he "messed it up". Therefore, Mary left the spoon with Joe, who tossed it over on a pile of other old silverware.
However, neither Joe nor Mary could explain why they did not inform the authorities immediately after their mother was arrested that the "alleged" stolen spoon seized during the search was actually "Mary's old spoon." Joe was present when the spoon was seized and Mary learned of the incident soon thereafter.
All of this disputed evidence was presented to the jury which determined that the appellant was indeed "guilty as charged."
 I
Appellant's first contention on appeal is that, because the "bon-bon" spoon was the product of an illegal search, the trial court erred in denying her "motion to suppress" said spoon as evidence.
The fact is undisputed that the search of appellant's store and her apartment above the store was conducted without a warrant. The prosecution's theory for justifying this "warrantless" search was that the appellant invited the searchers into the store and "voluntarily consented" to a search of the premises. The evidence on this "consent" theory was in sharp conflict.
Mr. Watson and the three law enforcement officers who conducted the search testified that the appellant, after she had been informed about the nature of their visit and had been read the Miranda warnings, in fact, initiated the search by suggesting that they search the premises because she "had nothing to hide." Mr. Watson and the officers never asked to search because the appellant suggested it first.
The appellant countered with testimony by her husband, her son, and herself that she never "consented" to the search, but merely "submitted" because she thought she had no choice.
The law is clear in Alabama that a "voluntary consent" will vitiate the requirement of a search warrant. Daniels v. State,290 Ala. 316, 276 So.2d 441 (1973); Garrett v. State,369 So.2d 827, 832 (Ala.Cr.App. 1978), rev'd on other grounds,369 So.2d 833 (Ala. 1979); and cases cited therein; Delarosa v. State,384 So.2d 876 (Ala.Cr.App.), cert. denied, 384 So.2d 880 (Ala. 1980).
It is also clear, as we have often held, that the trial court is in the best position to determine this "consent" or lack thereof. Jones v. State, 49 Ala. App. 438, 272 So.2d 910 (1973);Garrett v. State, supra; Holmes v. State, 342 So.2d 28
(Ala.Cr.App. 1976), cert. denied, 342 So.2d 36 (Ala. 1977).
The trial court must make its determination of the "voluntariness" of consent, as the United States Supreme Court prescribed in Schneckloth v. Bustamonte, 412 U.S. 218,93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), from the totality of the circumstances surrounding the event. Garrett v. State, supra;Holmes v. State, supra; Delarosa v. State, supra. It is only through this "careful sifting of the unique facts and circumstances of each case" that the trial court can ascertain whether the consent was in fact "voluntary" or coerced.Schneckloth v. Bustamonte, supra.
Here, the trial court was apparently persuaded by the prosecution's four witnesses who testified that the appellant "voluntarily consented." The trial court was obviously unimpressed by appellant's assertion that she did not "consent" but rather "submitted" because of the intimidation factors involved (i.e. four men coming to her door late at night implying that she was under arrest.) The facts revealed that the appellant had been contacted about the stolen goods when she was visited earlier in the evening by Mr. Watson and Doug Leeth who had requested a return of the silverware. *Page 982 
She was also notified by a police telephone call immediately prior to the search, that officers were downstairs and had been trying to attract the attention of the occupants of her store and apartment for over 30 minutes. These factors along with appellant's subsequent evidence that the spoon seized during the search belonged to "her daughter" instead of Mrs. Watson support the prosecution's contention that the appellant invited a search because she felt that she "had nothing to hide."
Having reviewed these and other facts surrounding the incident search, we find nothing to indicate that the trial court's finding of "voluntary consent" was erroneous. Compare,Jones v. State, supra; Holmes v. State, supra; Garrett v.State, supra.
The appellant further argues that the officers involved had plenty of time to obtain and should have obtained a search warrant for her store and apartment. We disagree.
We are reminded in Schneckloth v. Bustamonte, supra, of situations where as a practical matter, search warrants need not be obtained:
 "In situations where the police have some evidence of illicit activity, but lack probable cause to arrest or search, a search authorized by a valid consent may be the only means of obtaining important and reliable evidence. In the present case for example, while the police had reason to stop the car for traffic violations, the State does not contend that there was probable cause to search the vehicle or that the search was incident to a valid arrest of any of the occupants. Yet, the search yielded tangible evidence that served as a basis for a prosecution, and provided some assurance that others, wholly innocent of the crime, were not mistakenly brought to trial. And in those cases where there is probable cause to arrest or search, but where the police lack a warrant, a consent search may still be valuable. If the search is conducted and proves fruitless, that in itself may convince the police that an arrest with its possible stigma and embarrassment is unnecessary, or that a far more extensive search pursuant to a warrant is not justified. In short, a search pursuant to consent may result in considerably less inconvenience for the subject of the search, and, properly conducted, is a constitutionally permissible and wholly legitimate aspect of effective police activity." (Footnotes omitted.)
The trial record does not disclose the reason why a search warrant was not obtained in this case. Perhaps the officers in charge did not feel that the statements from the three boys, who had confessed to the theft, would satisfy the "probable cause" requirement. More than likely, however, the search merely followed a normal step in the chain of a police investigation, a step which undoubtedly would have been followed by an attempt to obtain a search warrant had "consent" not been given.
In any event, there was sufficient evidence presented by the prosecution to justify the trial court's determination that the appellant gave her "voluntary consent" to a search.
 II
Appellant also contends that her "motion to suppress" was erroneously denied because the "bon-bon" spoon produced at trial was not in "substantially the same condition" as it was when it was seized at the appellant's store. Appellant, therefore, argues that the required "unbroken chain of custody" was not sufficiently shown.
In the instant case, however, any defects in the "chain of custody" of the "bon-bon" spoon were cured, for admissibility purposes, when the spoon was positively identified in court by Mrs. Watson (R. 98-139) and by Mike Beavers (R. 174) as the same spoon that was stolen from the Watson residence and later seized by police officers at appellant's store. Douglas v.State, 366 So.2d 373 (Ala.Cr.App. 1979); Humphrey v. State,370 So.2d 344 (Ala.Cr.App. 1979). In fact, Mrs. Watson described the numerous identifying marks on the spoon *Page 983 
(R. 98-139), which had not been altered between the seizure and the trial, that left no doubt in her mind that the spoon seized was the one introduced at the trial, her silver plated "bon-bon" spoon that she had used for many years as a "baby spoon" for her children.
In establishing the authenticity of an item of evidence, an "unbroken chain of custody" is usually shown to prove that no one has "tampered" with said item. Humphrey v. State, supra. Part of the usual "chain of custody" proof is testimony "that the object is the same as, and not substantially different from, the object as it existed at the commencement of the chain." Sexton v. State, 346 So.2d 1177 (Ala.Cr.App.), cert denied, 346 So.2d 1180 (Ala. 1977); Douglas v. State, supra.
Appellant argues that this spoon was not "substantially in the same condition" at trial because a small portion of a script engraving on the handle had been obliterated by the police lab in an effort to raise the entire engraving which had been ground out before the spoon was seized. We disagree.
This slight alteration was not "substantial" enough to affect the spoon's admissibility, especially in light of the positive identification by Mrs. Watson and Mike Beavers, as herein noted.
Furthermore, the appellant also produced evidence that the same spoon, the one introduced at trial, was the one seized and that it belonged to her daughter.
The appellant's arguments concerning the identification of the spoon are, therefore, applicable to its weight and credibility, not to its admissibility. Williams v. State,375 So.2d 1257 (Ala.Cr.App.), cert. denied, 375 So.2d 1271 (Ala. 1979).
We are of the opinion that the testimony presented by the prosecution was sufficient to justify the trial court's denial of appellant's "motion to suppress" on this ground and to put to the jury the question as to whether or not the spoon presented at trial (and seized in the appellant's store) was the one stolen from Mrs. Watson's home. Bills v. State,49 Ala. App. 726, 275 So.2d 706 (1973); Humphrey v. State, supra.
 III
Appellant finally argues that the trial court erred in its denial of appellant's request (R. 249), after the direct examination of Steve Leeth (R. 247), for the production of all prior statements made to the police investigators by Steve and Doug Leeth and Mike Beavers.
Immediately after appellant made her request for the production of prior statements, the trial court and both counsel discussed the issues involved and the trial court correctly denied her request because no predicate had been laid to justify it. Gordon v. United States, 344 U.S. 414,73 S.Ct. 369, 97 L.Ed. 447 (1953); Jencks v. United States,353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957); Pate v. State, (Ms. May 8, 1981) (Ala. 1981); Cooks v. State, 50 Ala. App. 49,276 So.2d 634, cert. denied, 290 Ala. 363, 276 So.2d 640 (1973).
This requirement, that a proper predicate be laid prior to the request for production, was established to prevent "fishing expeditions." Jencks v. United States, supra. Usually, this requirement is satisfied by establishing that a specific prior statement was made by a particular witness and that said statement is necessary for the cross-examination of said witness. Pate v. State, supra; Gillogly v. State, 55 Ala. App. 230, 314 So.2d 304, cert. denied, 294 Ala. 200, 314 So.2d 306
(1975).
After her request had been denied and during her cross-examination of Steve Leeth, the appellant, arguably, did lay the requisite predicate for obtaining Steve's prior inconsistent statement (R. 278-281). The appellant solicited testimony from Steve that he had made a prior erroneous statement which he later corrected by making a second statement to the investigating officers. (R. 280). The discrepancies between these two prior statements were explained by Steve on "re-direct" by the prosecution (R. 291), when he testified that he *Page 984 
had incorrectly reported some of the "times" in the first statement which he corrected in the second. He further stated that the statements were consistent in that in both he admitted stealing the silverware and selling it to the appellant.
In any event, after laying the predicate, the appellant did not renew her request for production of the statements. The record does not disclose appellant's reasons for not renewing her request.
For aught that appears she was satisfied with the information obtained from Steve Leeth on further examination and decided that the statements themselves would not aid her defense.
Since no request was made and consequently no ruling was invoked after the predicate was laid, there is nothing further for us to review. We therefore hold that the only "request for production" which was made (R. 247) was premature and the trial court's denial of said request at that time was proper.
There is no error in this record.
For the foregoing reasons, this case is due to be and is hereby affirmed.
AFFIRMED.
All the Judges concur.