A jury found this appellant guilty under an indictment that charged, inter alia, that he did the following:
 ". . . [I]n the course of committing a theft of $15.00 in lawful currency . . . of the value of $15.00, the property of Winston Sachar, used force against the person of . . . Winston Sachar, with the intent to overcome his physical resistance *Page 204 
or physical power of resistance, or threatened the imminent use of force against the person of the owner or any person present, Winston Sachar, with the intent to compel acquiescence to the taking of or escaping with the property, while the said Willie Thomas alias Willie James Thomas was armed with a deadly weapon or dangerous instrument, to-wit: pistol, in violation of Section 13A-8-41 of the Code of Alabama. . . ."
At a sentence hearing after due notice that the State would invoke the Habitual Felony Offenders Act and upon proof of defendant's having been previously convicted of two felonies, the court fixed his punishment and sentenced him to imprisonment for life in accordance with Alabama Criminal Code, § 13A-5-9 (b)(3).
Except for the contested issue as to the identity of the alleged robber, there is little difference, if any, between the parties on appeal as to the time, place and circumstances of the robbery. In the first part of the Statement of Facts in appellant's brief, it is stated:
 "On the night of September 15, 1982, at approximately 9:00 p.m., an individual attempted to rob the Cloverdale A P in Montgomery, Alabama. The robber was a black male, wearing green clothing and with a stocking mask over his face. He was unsuccessful in robbing the A P but took the wallet of the assistant manager of the store which contained a total of $14.
 "Appellant, Willie James Thomas, is the owner and manager of Thomas Janitorial Service in Montgomery which has customers throughout Montgomery to whom it provides janitorial services. The customers have included the Eastdale Mall and the Cloverdale A P. On the night of the robbery, at approximately 10:45 p.m., the Montgomery City Police entered the HCB Building in downtown Montgomery where appellant was waxing the floor, and arrested him for the alleged commission of the robbery. . . ."
In the first part of appellee's Statement of Facts is the following:
 "Around ten minutes until 9:00 at night on September 15, 1982, as Winston Sachar, the Assistant Manager of the Cloverdale A P, and Freddy Hamilton, a clerk, were closing the grocery store for the night, they saw a black male dressed in green clothes and wearing a stocking mask walk across the parking lot. The man was carrying a gun. The man ordered Sachar inside the store and took Hamilton to the office where the safe was located. The man's mask fell off and he said, `Don't look at me.' . . . Hamilton ran and the robber shot his pistol in Hamilton's direction. The robber asked Sachar for his wallet as he left the store and Sachar gave him fifteen dollars."
We consider the issues raised by appellant in the order presented in appellant's brief.
 I.
The first issue presented by appellant is thus captioned in his brief:
 "The Admission of Appellant's Confession Into Evidence Constitutes Reversible Error."
During the testimony of Investigator James Hamner of the Montgomery Police Department for the State on direct examination as to an oral statement made to the witness by the defendant, the following occurred:
 "MR. MASSEY [Defendant's attorney]: Your Honor, we would like at this point to take the witness on voir dire outside of the presence of the jury.
 "THE COURT: Will the jury please step outside in the hall. It will be a little more comfortable.
 "(Whereupon, the following was heard out of the presence of the jury:)
"VOIR DIRE EXAMINATION
"BY MR. MASSEY:
 "Q. Detective Hamner, what time was it when Mr. Thomas signed the waiver of rights form?
"A. I believe it was around 11:25.
"Q. 11:25? *Page 205 
"A. Yes, sir.
 "Q. And after he signed that form, did you personally check with Sonitrol [personell of a building security system by that name]?
"A. As far as I know, my partner did.
 "Q. Do you know whether that was done by telephone or whether that was done physically?
"A. I am sure it was done by telephone.
 "A. Approximately at what time was it when you learned that according to Sonitrol Mr. Thomas had not checked in under his code number?
 "A. I am not sure exactly what time it was. I think it was some time after 11:25.
". . .
"Q. Were you wearing cowboy boots that night?
"A. I don't remember. I could have been.
". . .
"Q. Did you threaten Mr. Thomas at that time?
"A. No, sir, I did not.
 "Q. Did you use force against his person to make him give you an oral statement?
"A. No, sir, I did not.
 "Q. Do you have any signed statement or any written statement that you prepared to have Mr. Thomas sign?
"A. No, sir.
"Q. So there was nothing ever typed up?
"A. No, sir.
"Q. For Mr. Thomas to sign?
"A. No, sir.
 "Q. Do you deny kicking Mr. Thomas in the stomach and in the groin with your cowboy boots?
"A. I never did, no, sir.
 "Q. Were you a party or did you witness any other police officer with the Montgomery Police Department use force against Mr. Thomas?
"A. No, sir.
". . .
 "Q. What time did Mr. Thomas make these alleged admissions to you? What time was it when he made those?
 "A. I don't know exactly what time it was. It was after midnight.
 "Q. Did you keep Mr. Thomas up all night that night of September 15, 1982?
 "A. He was up there a while. I don't know if it was all night long.
". . .
 "Q. Detective Hamner, didn't you'all handcuff Mr. Thomas to a chair?
"A. Yes, sir.
 "Q. And isn't there some point during that interrogation there that night at the police station that Mr. Thomas had occasion to throw a chair at you?
"A. I don't remember him throwing a chair, no, sir.
"Q. Didn't you-all beat him with a telephone book?
 "A. No, sir. I stated earlier that no one beat him or hit him or threatened him.
"Q. Didn't you-all handcuff him to the chair?
 "A. He had one arm handcuffed to the chair. That is the way we do all of our suspects.
 "Q. Didn't you-all pin him to the chair and tell him not to get back up?
"A. No, sir.
 "Q. Isn't it a fact that you kept him up? After getting him some time near midnight that night, you kept him up until about 5:00 that morning?
 "A. Like I told you earlier, I don't know how long it was. It was on into the morning, but I don't think it was all night long.
 "Q. How long into the morning was it, then, Detective Hamner, that you got this voluntary statement from Mr. Thomas?
 "A. It was after 12:00. I would say it was probably 2:00.
". . .
 "Q. So it took you from 12:00 then to about 3:00 or 3:30 to get a voluntary statement from Mr. Thomas? Why did it take you three hours after you had Mr. *Page 206 
Thomas in custody to get a voluntary statement, Detective Hamner?
 "A. From the time we started, after the rights form, we have some other forms we fill out with the information, name, address, and such as that.
". . .
 "Q. What time did you pick Mr. Thomas up or was he picked up at the HBC?
"A. I don't know. I did not go.
"Q. 11:25, 11:30?
"A. I read him his rights at 11:25.
 "Q. So you agree with me that you talked with Mr. Thomas at least from 11:25 P.M. until some time around 3:00 or 3:30 A.M.; isn't that correct?
 "THE COURT: Okay. I agree with you. Bring the jury back in and we will tell them to go to lunch."
The transcript further shows clearly that defendant signed the printed "rights form" acknowledging that he had been informed as to his Constitutional rights, including a right to an attorney, that he understood his rights. Thereafter, according to Officer Hamner, defendant made oral statements, which at first were in denial of any participation in or knowledge of the robbery and contained assertions that he was at the HCB Building at the time of the alleged robbery. Officer Hamner further testified that when defendant was confronted with information that the Police Department had checked with "Sonitrol" that operated the security system for the HCB Building and had learned that defendant "had not called in to Sonitrol that night" before the time of the robbery, the following occurred:
 "A. From that point, we went through his story again and broke it down. He said that — with me and my partner there, he wanted to go ahead and tell us what really happened.
"Q. Your partner being who?
"A. Investigator Brown.
"Q. Go ahead.
 "A. He said that he did not want anything in writing. That he would just talk to us, and we told him okay. He said that a man named Leonard came by in a green car and picked him up. They went riding around, and Leonard gave him a gun and said let's go rob the A 
P. We need money. From that point, they went there. Willie said that he went in and approached them as they were coming out. He went inside and tried to hold the place up. He said that he went to try to get into the safe, and he could not. The manager would not let him in the safe. From that point, he said that he noticed the boy standing there, and that's when he shot at him. Then he took the money that the manager had, which was a ten dollar bill and four ones and left. He gave Leonard the four dollars and he kept the ten dollar bill.
"Q. Did he tell you how many shots were fired?
"A. He just said he shot.
 "Q. And he told you he had fourteen dollars from the robbery?
"A. Right.
"Q. Ten for him and four for Leonard?
"A. Yes.
 "Q. Okay. Now, did he tell you anything about a wallet that was taken in the robbery?
 "A. He further said that he took the wallet and threw it out of the vehicle somewhere on Carter Hill Road down on one of the side streets. I don't know if he meant on Carter Hill Road or one of the side streets.
"Q. Do you know where this wallet was recovered?
 "A. It was recovered somewhere in the ASU campus area.
 "Q. Is that the same location where the defendant told you he had thrown the wallet?
"A. Thereabout, yes, sir."
Appellant is correct in the assertion in his brief that an extrajudicial confession is prima facie involuntary. However, he does not support his conclusion that the voluntariness of his confession was not established by the evidence. None of the cases cited by him supports such a conclusion. He argues: *Page 207 
 "Although not quite as severe as the facts in the case of Garrett v. State, supra, [Ala. 369 So.2d 833
(1979)], the facts in this case are quite similar. In Garrett the defendant, a mentally retarded juvenile was interrogated for approximately the same amount of time as appellant was questioned in the present case, was interrogated without counsel or any members of his family present and was given no food during the interrogation. The Alabama Supreme Court held that the totality of the circumstances indicated that the confession was involuntary and should not have been admitted into evidence, reversing and remanding the conviction. In the present case, the appellant was not a mentally retarded individual, but the manner in which the police treated him during his four to four and a half hour interrogation without the benefit of counsel and in the wee hours of the morning tend to establish that the confession was induced through coercive tactics. Since the prosecution offered absolutely no evidence to rebut the presumption that the confession was involuntary, it should not have been admitted into evidence."
Garrett v. State is an extraordinarily valuable case on the question under consideration, but instead of it leading to a conclusion that the admission of the confession in the instant case was erroneous, it leads in the other direction when contrasted to the facts in the instant case, particularly in the following paragraph at 369 So.2d 836:
 "In this case we have a juvenile defendant who is mentally retarded to the point that he was classified by his teachers as trainable, but not educable. That he can only be trained to take care of his daily needs. According to the teachers, he could not remember his class schedule from day to day. Nor could he understand any abstract words. For example, if Garrett were told he had a right to remain silent, he would not have understood what the word `right' meant and would probably would not have understood what the words `remain' or `silent' meant. Two teachers testified that they did not believe Garrett would have understood the Miranda warnings. One of them testified Garrett would have said he understood the warnings, regardless of whether he did or not, in order to please the interrogator."
In none of the evidence in this case is there any allusion to any lack of intelligence or the like of the defendant, except in the actual commission of the alleged crime. The evidence strongly supports a conclusion that he was extra-ordinarily worldly-wise. This difference between the appellant and Garrett was a material factor in the inadmissibility of the confession in Garrett. Furthermore, we cannot agree with either of the last two sentences of appellant's brief as quoted above. Appellant was not denied his right to counsel at the time of the confession; he was adequately and comprehensively advised of that right and of the consequences of a waiver thereof. Instead of there being "no evidence to rebut the presumption that the confession was involuntary," we find no substance for any contention that it was not voluntarily, intelligently and understandably made. The trial court was not in error in overruling defendant's motion to suppress the confession.
 II.
This issue presented by appellant is thus stated in his brief:
 "The Admission of Illegally Seized Items Into Evidence Constitutes Reversible Error."
There were many references in the testimony to the clothing worn by the robber and to clothing in the van defendant was driving at the time of the robbery that was found in the van by the officers after defendant's arrest. There were also references in the testimony to some clothing found in defendant's home while defendant's wife was at the home and while defendant was under arrest on the night of the robbery. A large part of such evidence was during the testimony of defendant's wife as a witness for defendant. We do not find anything in the transcript to indicate *Page 208 
an objection by defendant to any of the testimony relative to such clothing. This precludes us from a determination of this particular issue. West's Alabama Digest, Criminal Law, Key Nos. 1030 (1) and 1030 (2).
 III.
The third issue presented by appellant is stated in his brief as follows:
 "Appellant's Conviction Should be Reversed Due to Ineffective Assistance of Counsel."
Notice of appeal of the judgment of conviction and sentence was given by the attorney who represented defendant on the trial of the case but who does not represent him on appeal. The record does not show what attorney represented appellant between the date of appeal on March 15, 1983, and the date of appellant's brief on September 15, 1983. The record does not show whether any motion for new trial was ever filed with the trial court or its clerk. It is recognized that ineffective assistance of counsel constitutes a valid ground for a motion for a new trial. Scoggins v. State, Ala.Cr.App., 398 So.2d 353
(1981), cert. denied, 398 So.2d 357. That it can constitute a valid basis for petition for writ of error coram nobis presentable to the trial court is also firmly established. Having in mind that a contention that defendant in a criminal case did not receive effective assistance of counsel should first be presented to the trial court that rendered the judgment of conviction and sentence, we should not endeavor to pass on such issue at this time. Not only is it not presentable for the first time on appeal, but also any indication by us at this time as to the merits of such a contention would be inappropriate by reason of its tendency to influence the trial court as to its action on any coram nobis petition presented to the trial court as to the judgment from which this appeal was taken.
 IV.
Appellant urges that the "Verdict is Unsupported by and in Clear Contradiction with the Evidence." In addition to the circumstantial evidence pointing to the defendant as one who participated in the robbery and the confession of the defendant, the testimony of Frederick D. Hamilton, an eyewitness to the robbery, identified defendant as follows:
 "Q. Is this the same person that robbed you and Mr. Sachar?
"A. Yes.
 "Q. All right. I will ask you to look around in the Courtroom and tell us whether or not you can identify that person here today?
"A. Yes.
 "Q. Please point him out for the ladies and gentlemen of the jury.
"A. He is sitting to my left.
 "MR. HAWTHORNE [Assistant District Attorney]: Let the Record reflect that the witness correctly identified the Defendant."
A jury question was presented by the evidence as to the defendant's guilt. The question as to the weight of the evidence was not raised by any motion for a new trial, and we decline to comment on any such question.
 V.
By the fifth and last issue presented in appellant's brief, it is contended that the application of the Habitual Felony Offenders Act was improper and that the sentence imposed thereunder constitutes cruel and unusual punishment. He divides this issue into two separate and independent parts. We consider both in the order presented by appellant in his brief. He says as to the first:
 "At the sentencing hearing, Judge Hooper asked the prosecution to present him with certified copies of appellant's prior convictions. It does not appear, however, that the prosecution gave him such copies. In fact, the prosecution was apparently confused as to the case numbers of his prior convictions. The certified copies were not attached to the prosecution's motion to invoke the Act and they are not now in the record. Accordingly, *Page 209 
it was improper for the Circuit Court to have applied the Habitual Offender Act in this case, and the sentencing under the Act should be reversed."
It is not as clear as it should be from the transcript of the proceeding quoted above, but, in the absence of an unequivocal contention to the contrary, we are persuaded that the following portion of the transcript discloses that there had been two previous felony convictions:
"THE COURT: Previous convictions?
 "MR. MASSEY: Just two robberies, there, sir, that they had incorrect information on.
 "THE COURT: Is that what that means down there? (indicating).
"MR. MASSEY: They had it incorrect on this motion.
 "THE COURT: That would have been hard to figure. Okay. Do you have your certified copies?
 "MR. TRAVIS: I'm thinking this is it but I'm not sure. It's my understanding the two we are talking about are 3216 and 3120; two robberies.
"THE COURT: Okay.
"MR. MASSEY: He was in jail when that happened.
 "THE COURT: I have before me from the 10th Judicial Circuit, Jefferson County, a robbery which shows that and it is certified properly that the defendant was found guilty of robbery or entered a guilty plea and was given ten years — no. He was found guilty by a jury. And, he was given ten years. Then, in a case of 69214. Okay. You got anything to say prior to sentencing?
 "MR. MASSEY: No, sir, Your Honor. We would have something to say, but it's with respect to this appeal.
 "THE COURT: I understand. Based upon the finding of the jury of the defendant being guilty of robbery, and based upon these two previous felonies, I have no choice but to give you life in the penitentiary and the other news is, you can't set a bond if it's more than — if it's that much of a sentence, I can't set a bond by law. . . ."
In the other part of the fifth issue presented in appellant's brief, appellant contends that the life sentence imposed constitutes cruel and unusual punishment in violation of the Eighth Amendment to the Constitution of the United States. As to this contention, appellant relies exclusively upon Solem v.Helm, ___ U.S. ___, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), in which the majority opinion invalidated a penalty of life imprisonment without probability of parole that was imposed for the appellant's seventh nonviolent felony. That case is inapposite to this case in which the conviction appealed from was for the violent crime of robbery, a Class A felony, and that each of the two previous convictions was for the same kind of a felony.
In our opinion, no issue presented on appeal reveals any error prejudicial to defendant and no obvious prejudicial error was committed by the trial court. The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur. *Page 655