Thirty-year-old Curtis Sasser was indicted and convicted for the first degree sodomy of his six-year-old niece. Sentence was twenty years' imprisonment. On appeal, Sasser argues that his confession was involuntary and inadmissible, primarily because of his mental retardation.
"The question of whether a confession is voluntarily made turns on the totality of the circumstances in each particular case." Moore v. State, 415 So.2d 1210, 1211 (Ala.Cr.App.), cert. denied, 459 U.S. 1041, 103 S.Ct. 459, 74 L.Ed.2d 610
(1982). See also Green v. State, 439 So.2d 816, 818
(Ala.Cr.App. 1983).
 "`The voluntariness of a confession, authorizing its admission into evidence, must be determined by the trial judge in the exercise of enlightened discretion . . .' Burks v. State, 353 So.2d 539 (Ala.Cr.App. 1977). When conflicting evidence is presented concerning the facts and circumstances surrounding a confession, the trial judge must decide on its admissibility. Hobbs v. State, 401 So.2d 276
(Ala.Cr.App. 1981). The trial court's decision will not be overturned on appeal unless it appears to be palpably contrary to the great weight of the evidence or is manifestly wrong. Burks v. State, supra." Womack v. State, 435 So.2d 754, 761 (Ala.Cr.App.), affirmed, 435 So.2d 766 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983).
"While an accused's intelligence and literacy are important factors to be considered in determining whether he intelligently and voluntarily waived his constitutional rights and made a confession, weak intellect or illiteracy alone will not render a confession inadmissible. Elrod v. State, 281 Ala. 331, 202 So.2d 539 [(1967)]; Twymon v. State, Ala.Cr.App.,358 So.2d 1072 [(1978)]; Arnold v. State, Ala.Cr.App.,348 So.2d 1092 [(1977)]." Hobbs v. State, 401 So.2d 276, 282 (Ala.Cr.App. 1981). See also Garrett v. State, 369 So.2d 833, 835-36 (Ala. 1979); Womack, supra. Where the defendant's mental subnormality is so great as to render him totally incapable of understanding the meaning and effect of his confession or preliminary waiver of constitutional rights, the confession is inadmissible. Annot., 8 A.L.R.4th 16, 28 (1981), and cases cited therein.
 "Thus, in most cases, the defendant's mental deficiency will be but one factor to be considered in the `totality of the circumstances' surrounding the confession. In some cases, however, it may be the most important or controlling factor. See e.g. Dover v. State, 227 So.2d 296 (Miss. 1969); People v. Langston, 57 Mich. App. 666, 226 N.W.2d 686 (1975). See also Redwine v. State, 258 Ala. 196, 61 So.2d 724
(1952). The importance of this factor increases with the degree of the accused's mental retardation because he must be able to understand his right to remain silent and to an attorney before he can waive them. It is a knowing and intelligent waiver that is required. Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)." Garrett v. State, 369 So.2d 833, 836 (Ala. 1979).
See also Corbin v. State, 412 So.2d 299, 301 (Ala.Cr.App. 1982) ("Except in the most extreme cases, the mental abnormality of the accused is just one factor which must be considered in determining from the totality of the circumstances the voluntariness and admissibility of a confession.").
In this case, the State made a prima facie showing that Sasser knowingly and intelligently waived his constitutional rights and that his confession was voluntarily given.
At the pretrial hearing on Sasser's motion to suppress, Detective Ronnie Phillips testified that he orally gave Sasser his Miranda rights after his arrest at the Sheriff's substation. While transporting Sasser to the Sheriff's office in town, Sasser told Phillips "he had put his hand on the girl, but that is all he had done." After arriving at Phillips' office, Sasser was again advised of his rights. At this time, Sasser signed a *Page 1133 
waiver form. The detective testified that he read every portion of the waiver form to Sasser, asked Sasser if he understood, and that Sasser signed the waiver.
Phillips conducted an interview with Sasser, which was taped and subsequently transcribed. Although Sasser at one point "was very upset", "broke down crying", and "had to vomit," Sasser "got calmed down" and Sasser and the detective talked. Sasser never attempted to retract the waiver. Phillips stated that no threats, promises or inducements of any kind were made or offered to persuade Sasser to make a statement. Sasser later refused to sign the transcribed statement.
Although Phillips played the taped statement back to Sasser, he did not read the transcribed statement to Sasser because "[h]e said he wasn't going to sign it." When asked by defense counsel if he ascertained whether Sasser could read or write, Phillips replied that Sasser told him he could not. Sasser also told Phillips that "he went through the 12th grade in special education."
It was not until after Sasser had been advised of his rights and Phillips and Sasser began talking that Sasser "broke down crying and had to vomit." Phillips testified he did not ascertain that Sasser could not read or write until "we talked, and then when I got the statement I asked him." Phillips stated that he did not ask Sasser if he could read or write prior to Sasser's signing the waiver form. Phillips "read it over to him, but I didn't ask him if he could read or write." Phillips asked Sasser "did he understand it (rights and waiver form), and he said yes, the best of my recollection."
In conflict with Detective Phillips' testimony, Sasser testified that Phillips read him his Miranda rights, but Sasser stated he did not understand those rights. Sasser indicated that he did not know what it meant "to have the right to counsel." He stated that "the right to remain silent" meant "when you're not supposed to talk." Sasser testified he "went throught the 12th grade," in "special education" classes. Sasser stated that he was unable to read or write, but could write his name. Sasser asserted that he did not understand that he had the right to have a lawyer present when he gave his statement to Detective Phillips. However, Sasser stated that he did understand that his statement was going to be used in court against him.
When asked if Detective Phillips made any statements about what was going to happen to him, Sasser replied that Phillips "said that they'd probably give me ten to twenty years, and then said, it's nothing compared [to] what I would do to you." When Sasser refused to sign the transcribed statement, Sasser said Phillips "got mad . . . and told me that he was going to see that I get life — I mean, see that I never get out." Sasser stated he felt threatened "in a way" by Detective Phillips. On cross examination, Sasser again stated that he understood that Phillips was going to use his statement in court.
Detective Phillips testified in essentially the same manner at trial. Sasser did not testify in his own behalf.
Sasser's transcribed statement, admitted into evidence at trial, reveals in pertinent part as follows:
 "Q. [Detective Phillips]: How far did you go in school?
 "A. [Sasser]: I went through the 12th in the Special Education."
* * * * * *
 "Q. Do you understand your rights as they were advised to you prior to you telling me about this incident?
"A. Yes sir."
* * * * * *
 "Q. OK, have I or any officer promised you anything or threatened you in any way or told you it would be any lighter on you for giving us this statement?
"A. Sir?
 "Q. Have I or any officer promised you anything or threatened you in any way or told you it would go lighter on you if you give us this statement, have I promised *Page 1134 
you anything for you to tell me the truth?
"A. No sir, maybe some psychiatric help.
 "Q. But I didn't promise you that, is that correct, that would have to be seeked out by you, I didn't promise you I was going to get you psychiatric help, did I?
"A. No sir.
 "Q. And this statement is given of your free will, is that correct?
"A. Yes sir."
The only evidence of Sasser's illiteracy or low mentality offered at the suppression hearing or at trial was in the form of statements made by Sasser to Detective Phillips and Sasser's own testimony. This testimony suggests that Sasser had only gone "through the 12th grade in special education," and that Sasser was unable to read or write, but could write his own name. This testimony does not show that Sasser was so mentally deficient that he was incapable of being able to make a knowing and intelligent waiver. See, e.g., Hobbs v. State,401 So.2d 276, 282 (Ala.Cr.App. 1981) (no evidence was presented that the defendant was illiterate or mentally incompetent where the only evidence of his low mentality or illiteracy was testimony by him and his mother "that although he had gone to the twelfth (12th) grade in a `special school,' he could only read on a fifth or sixth grade level").
Based upon the evidence presented, the trial court's ruling denying Sasser's motion to suppress his confession cannot be said to be "palpably contrary to the great weight of the evidence or . . . manifestly wrong." Womack v. State, supra.
A different conclusion is not warranted when we consider the expert testimony offered by Sasser at sentencing. Michael Brock, a psychiatric social worker employed by the Mobile Mental Health Center, admitted that Sasser knew the difference between right and wrong. Jim Flora, a master's level psychologist at the Mobile Mental Health Center, psychologically evaluated Sasser. Sasser "had a verbal IQ score of 67, a performance IQ score of 69, and a full-scale IQ score of 66, and all these fall within the range of mild mental retardation." Flora testified that "People with an intelligence level within the range of 50 to 70, which is mild mental retardation are considered to be educable" and that "a person with an IQ within this level is considered to be capable of self-support with proper education." Sasser was considered educable but would "frequently need advice and counseling particularly at times of extreme stress." Sasser was diagnosed as a mentally retarded pedophiliac. Flora also acknowledged that Sasser understood "the nature of what he was doing and that it was in fact wrong."
Neither Brock nor Flora expressed an opinion as to whether Sasser, due to his mental retardation, was able to make a knowing, intelligent, and voluntary waiver of his constitutional rights. As we noted in Mitchell v. State,338 So.2d 524, 525 (Ala.Cr.App. 1976):
 "In order to hold that the appellant was incapable of voluntarily confessing, we would have to take judicial notice of a fact not in evidence, i.e. that a person with an I.Q. of 65 does not have the mental capacity to voluntarily confess. This we cannot do. The appellant's expert witness testified that the appellant knew right from wrong and that an I.Q. of 65 indicated moderate mental retardation. There was no evidence as to what effect an I.Q. of 65 has on one's capacity to make a knowing, intelligent, and voluntary confession."
Here, the State presented a prima facie showing of voluntariness — Sasser stated that he understood his rights and signed a waiver. The expert testimony of Sasser's degree of mental retardation does not foreclose a knowing and intelligent waiver as defined by constitutional requirements. Sasser's own testimony that he did not understand his rights presented a conflict in the evidence which only the trial court could resolve. The judge had the opportunity to observe Sasser's demeanor while testifying. Based on the record before *Page 1135 
this Court, we find that the judge's finding of voluntariness is not palpably wrong or contrary to the great weight of the evidence. Consequently, the judgment of the circuit court is affirmed.
AFFIRMED.
All Judges Concur.